**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FOOD FAIR STORES, INC., and Retail Food Clerks Union, Local 1245, Retail Clerks International Association, AFL-CIO, Respondents.**

**No. 13716.**

United States Court of Appeals Third Circuit.

Argued April 24, 1962.

Decided Aug. 6, 1962.

4

Samuel M. Singer, Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Earle W. Putnam, Attys., N. L. R. B., on the brief), for petitioner.

Stephen C. Vladeck, New York City (Vladeck & Elias, New York City, on the brief), for respondents Retail Food Clerks Union, Local 1245, Retail Clerks International Ass'n, AFL–CIO.

Warren J. Kaps, Jersey City, N. J. (Stein, Kripke & Rosen, Jersey City, N. J., on the brief), for respondent Food Fair Stores, Inc.

Before HASTIE, FORMAN and SMITH, Circuit Judges.

FORMAN, Circuit Judge.

The National Labor Relations Board (Board) has petitioned for enforcement of its order, issued May 24, 1961, against Food Fair Stores, Inc. (Company) and

Retail Food Clerks Union, Local 1245, Retail Clerks International Association, AFL-CIO (Union).[1]

A brief statement of facts is as follows: The Company is comprised of a chain of retail stores or supermarkets in various states, including New Jersey, where its sales exceed $3,000,000 and the inflow of products from out of the state exceeds $50,000 per year. The Union includes in its membership employees in the 58 stores of the Company in Northern New Jersey, known as Branch 6. The charging parties are sisters, Florence and Elizabeth Brooks, who are "front end clerks" at the Company's Bergenfield and Teaneck stores respectively. All parties concede that a collective bargaining contract was in effect between the Company and the Union in which Union membership was a condition of employment and that it provided for a checkoff of union dues, although the contract, itself, was never produced in evidence.

On April 6, 1959, the Union met and, by a majority of its members present, voted a special assessment amounting to $15.00 to be paid by every member to aid the striking employees of another chain of food stores. Most of the employees paid the assessment directly to the Union. Shortly thereafter the Union requested the Company to check off the assessment from the wages of those who had not paid. At first the Company declined, taking the position that it was not a legitimate subject of checkoff under the contract with the Union. The Union threatened to compel arbitration of the issue. After several months of negotiations and upon the advice of its counsel that the demand for the checkoff was proper, the Company agreed. Its acquiescence was evidenced by a notification to the managers of each store from John Borland, Jr., the personnel manager of Branch 6, stating that the Company had agreed to the checkoff and that arrangements therefor would be made in the near future.[2]

The Trial Examiner found that within the period of six months prior to the filing of the complaint the officers of the Union threatened individual employees of the two stores aforementioned with discharge if they did not pay the assessment. He also found that the memorandum of the personnel manager, Mr. Borland, was a "pervasive" threat to the employees of all 58 stores and that he and the managers of the Bergenfield and Teaneck stores also informed certain employees that failure to pay the assessment would result in the loss of their jobs. Eleven employees in the Bergenfield store and ten in Teaneck were delinquent in paying any or all of the assessment on January 15, 1960. On January 19 and 23, 1960, collections were made in

---

1. The decision of the Board is reported at 131 N.L.R.B. 756 (1961).

2. The notice read as follows:

"FOOD FAIR STORES, INC.
"INTER COMPANY MEMO
"Date: November 3, 1959
"From: Mr. John Borland, Jr.      To: All Store Managers, Branch 6
"cc: Mr. L. Finkelstein
"District Managers, Branch 6
"Mr. A. Adams, Mr. R. Neale
"Re: Strike Assessment Local #1245
"Reference is made to a recent assessment by Local #1245 against our employees who are members of the Local. Some of our employees did not pay this assessment.
"After continuous negotiation with Local #1245, it has finally been decided that the Company will check-off the assessment. Arrangements for the check-off will be made in the near future.
"If you have any question, please contact me."

these respective stores from all.[2a] Accordingly the Examiner concluded that:

"1. By threatening employees with discharge if they did not pay the strike assessment and by exacting payment thereof pursuant thereto, the Employer discriminated against employees in violation of Section 8(a) (3) and interfered with, restrained and coerced employees in the exercise of their statutory rights in violation of Section 8(a) (1) of the Act.

"2. By causing and attempting to cause the Employer to discriminate against employees in the manner aforesaid, the Union engaged and is engaging in an unfair labor practice in violation of Section 8(b) (2) of the Act. Thereby, and also by itself threatening employees with discharge if they did not pay the assessment the Union restrained and coerced employees in the exercise of their statutory rights, thus engaging in an unfair labor practice within the meaning of Section 8(b) (1) (A) of the Act."[3]

The Examiner also held that the circumstances surrounding the receipt of the memorandum of November 3, 1959 at the Bergenfield and Teaneck stores were typical of the conditions prevailing in all of the other stores. He recommended that all of the employees of Branch 6 who paid part or all of the

---

[2a.] The record is not clear as to when all of the delinquent assessments in the other stores were liquidated.

[3.] The pertinent provisions of the National Labor Relations Act are:

Section 7:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a) (3) of this title." 29 U.S.C.A. § 157.

Section 8(a) (1) and 8(a) (3) (B):

"§ 158. Unfair labor practices

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\* \* \* \* \*

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, \* \* \* *Provided further,* That no employer shall justify any discrimination against an employee for nonmembership in a labor organization \* \* \* (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; \* \* \*" 28 U.S.C.A. § 158.

Section 8(b) (1) and (2):

"(b) It shall be an unfair labor practice for a labor organization or its agents—

"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; \* \* \*

"(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; \* \* \*" 29 U.S.C.A. § 158.

assessment after the latter date should be jointly and severally reimbursed by the Company and the Union for such payments. He also recommended that the Company and the Union implement the decision with advice to the employees that failure to pay the assessment will not be the cause of discharge and other pertinent information to be accomplished by the posting of the usual notices.

Two of the three members of the National Labor Relations Board panel adopted the Examiner's findings, conclusions and recommendations with only slight modification. The third member dissented.

The legal issue revolves around the question of whether the assessment in this case is to be construed as within the term "periodic dues" as used in Sections 8(a) (3) and 8(b) (2) of the National Labor Relations Act (Act). Section 8 (a) (3) makes it an unfair labor practice for an employer in a union shop to discriminate against an employee for nonmembership in a labor organization "(B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employees to tender the *periodic dues* and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *." (Emphasis added.)

Section 8(b) (2) makes it an unfair labor practice for a union to attempt to cause "an employer to discriminate against an employee in violation of subsection (a) (3) * * * on some ground other than his failure to tender the *periodic dues* and initiation fees uniformly required * * *." (Emphasis added.)

The Board contends that the assessment is not within the definition of "periodic dues", ergo the alleged threats to have employees discharged are violations of the above sections.

Both the Union and the Company take exception to the fact finding of the Examiner and the Board that threats of discharge were made by their officials to the employees.

The Examiner found that Mr. Borland, the personnel manager, conveyed to employees the information that once the Company decided that the assessment was a proper subject of checkoff it would have no alternative but to discharge the employees for failure to pay the assessment if requested by the Union and that his notification of November 3, 1959 was a declaration that the Company would apply the same sanction of discharge as it would to nonpayment of dues.

Mr. Borland testified that he "believed" that Richard L. Johnston, the Acting Secretary-Treasurer of the Union told him in October or November 1959 that he would request the discharge of employees who did not pay the assessment.

The Examiner concluded that the Union caused the Company to make the "threat" which he found inherent in the memorandum of November 3, 1959, and that this alone would support the charge that both the Union and the Company had violated the Act as charged in the complaint. However, he took cognizance of other testimony implicating officials of the Company and the Union in making specific threats to some employees who did not pay the assessment.

The Misses Brooks testified that Mr. Johnston stated to them in April of 1959 [4] that if they did not pay the assessment they would lose their jobs. In addition Florence Brooks stated that

---

4. The April conversation between the Misses Brooks and Mr. Johnston having occurred more than six months before the filing of the complaint is barred from being the basis of an unfair labor practice by the six months statute of limitations contained in Section 10(b) of the Act, as amended 29 U.S.C.A. § 160 (b). However, Section 10(b) does not ordinarily bar evidentiary use of anterior events which shed light on the true character of matters occurring within the limitations period. Local Lodge No. 1424 Intern. Ass'n of Machinists, AFL-CIO v. National Labor Relations Board, 362 U.S. 411, 416, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960).

**8**

Mr. Johnston repeated the threat to her in June or July of 1959. Florence Falasca, an employee of the Bergenfield store, gave similar testimony concerning Mr. Johnston without being specific as to the date of their conversation.

Gene Mulvihill, Business Agent and First Vice President of the Union, was taxed with similarly informing the following employees: Florence Brooks in June or July 1959 and January 1960, Elizabeth Brooks in August 1959, John Harley of the Bergenfield store in January 1960, and Florence Falasca, also of the Bergenfield store, in November of 1959.

Frank De Vito, Acting President and Business Agent of the Union, also was said to have insisted upon payment of the assessment under pain of discharge to Florence Brooks in January 1960 and Florence Falasca in November 1959.

The following officials of the Company were implicated in conveying information directly to employees to the effect that if they did not pay the assessment they would lose their jobs. In the case of Mr. Borland, Elizabeth Brooks testified that shortly after he had sent out his letter of November 3rd to the store managers, she had a conversation with him in which he said: " * * * he would have to go along with the agreement with the union, that he would have to take the money out of our pay or we would be discharged." The same Elizabeth Brooks testified that William Sisti, the manager of the Teaneck store, actually took the amount of the assessment, $15.00, out of her pay envelope on January 19, 1960 over her objection, with the statement that rather than see her lose her job he was taking the assessment out of her pay. Mr. Sisti substantially corroborated Miss Brooks. Irving Ring, manager of the Bergenfield store, was said by Florence Brooks to have acted similarly to Mr. Sisti, taking the amount of the assessment from her pay envelope

after telling her that he was not going to see her lose her job. She also testified that she witnessed Mr. Ring lend Paul Wright, another employee, $15 to pay the assessment to save his job. Paul Wright corroborated her.

The Union charged that there was no proof that it ever requested the Company to discharge a single employee for failure to pay the strike assessment. It submits that the evidence showed no more than a request by the Union to check off the assessment and that the only remedy it sought for failure to do so was to request the submission of the matter to arbitration for the purpose of determining the Company's obligation relative to assessments.

█ True it is that there is no evidence that the Union requested the Company to discharge any employee for nonpayment of the assessment. Indeed there was no reason for such a request because the Company acquiesced to the checkoff. But there can be little doubt that in pressing Mr. Borland to honor a requested check off of the assessment Mr. Johnston informed him that he would request the discharge of employees who did not pay it.

█ The Union also urged that an analysis of the testimony of the employees who stated that they had been threatened by the respective Union officials discloses that such testimony was inconsistent and lacked substantiality and reliability to support the Board's findings and that this was not in accordance with the preponderance of the evidence.

The Company argued that there was no substantial evidence in Mr. Borland's testimony on which to base a conclusion that the checkoff by the Company of the assessment implied "possible sanctions of discharge for noncompliance."

The Board had before it Mr. Borland's admission [5] that he had informed em-

---

5. The Company is critical of the Trial Examiner in making the factual determination in this regard upon the one

word answer by Mr. Borland to his question of 74 words in the face of prior and subsequent testimony by Mr. Borland

ployees that once the Company decided that the checkoff of the assessment was proper he would have no other alternative but to discharge the employees if they failed to pay. It also had the testimony of Elizabeth Brooks that Mr. Borland told her, sometime after he had notified the store managers on November 3, 1959, to check off the assessment, that he would be obliged to go along with the agreement with the Union and take the money out of the pay of the employees or they would be discharged. In the light of this evidence the Company's objection that Mr. Borland's testimony laid no basis for the Board's conclusion that the checkoff by the Company implied the sanction of discharge for non-compliance is without merit. Aside from any implied nature of the threat to discharge there was the assertion by Mr. Borland and the managers that failure to pay the assessment would cause the defaulting employee to be discharged.

A considerable dispute is raised by the testimony of the witnesses of the Company and the Union as to the probity of the witnesses of the General Counsel. However, the resolution of questions of credibility rests with the Board (which adopted in full the findings of the Examiner) and is not within the province of the court to overturn. N. L. R. B. v. Lewisburg Chair and Furniture Co., 230 F.2d 155, 157 (3 Cir.1956); Paul M. O'Neill Inter. Detective Agency, Inc. v. N. L. R. B., 280 F.2d 936, 943 (3 Cir. 1960). A review of the record as a whole reveals substantial evidence to support the Board's conclusion that the strike assessment was exacted from certain employees as a condition of continued employment by representatives of both the Company and the Union. See Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

However, even though there is a finding that there was a threat of discharge for non-payment of the strike assessment it is not a violation of the Act if the assessment comes within the concept of "periodic dues" as used in Sections 8(a) (3) and 8(b) (2). Hence we address ourselves to that question.

The Board and the Union agree that Sections 8(a) (3) and 8(b) (2) were adopted to eliminate the closed shop and its concomitant abuses; to allow the union shop; and that the exception permitting discharge for the nonpayment of dues was designed to eliminate "free riders", i. e., to prevent employees from enjoying union benefits without accepting the responsibility of fairly sharing the cost of maintaining the Union. They differ on the breadth to which the exception providing for discharge for nonpayment of dues shall be construed. The Board interprets it narrowly and the Union broadly.

The Union's basic proposition is that an assessment consisting of a "compulsory levy imposed in addition to fixed dues on all union members * * * [the] payment of which is uniformly required by the union as a condition of retaining union membership constitutes 'periodic dues' within the meaning of Sections 8(a) (3) and 8(b) (2)." It claims that the construction placed on the term "periodic dues" by the Board defeats the manifest purpose of the stat-

qualifying his answer. The question and answer follow:

"Trial Examiner. What you were conveying to them was while you have to make a decision whether it is a proper check-off, once the Company decides, pursuant to whatever advice it deems proper, that it is a proper check-off, then it would consider itself as having no alternative but to discharge the employee if she should become in bad standing as a result of not paying that particular assessment; is that the purport of your message?

"The Witness: Yes."

The numerous quotations from Mr. Borland's testimony cited by the Company, which it claims qualify his answer, fail to weaken it. The question is clear and reasonable in the face of Mr. Borland's testimony and the affirmative answer to it was given without any apparent hesitation and can be reconciled with the other statements made by Mr. Borland.

utory provisions and is unreasonable as being totally unjustified by the legislative history.

In support of its interpretation of the words "periodic dues" the Board cites Ballentine's and Black's Law Dictionaries;[6] *two decisions of the United States Supreme Court;*[7] an opinion of the United States District Court for the Eastern District of New York;[8] a labor arbitration decision[9] and a statement in a 1959 publication of the AFL-CIO on union security.[10]

The Union counters by citing the definition of "periodic" in Webster's Third International Dictionary as encompassing "occurring at regular intervals" or "occurring repeatedly from time to time, recurrent, intermittently." It combines this with the definition of "dues" as "the fee or charge required for membership" and claims that assessments, as a matter of trade practice, are levies made from time to time, payment of which is required for membership.

Further, the Board contends that Congress in the same statute[11] differentiated between the terms dues and assessments in the reporting requirements and that this indicates that a careful distinction was drawn between the two terms, pointing out that if Congress had intended that assessments fall within the exceptions to Sections 8(a)(3) and 8(b)(2) it would have said so specifically.

The Union directs attention to the reporting section as referring to "regular dues" and the unfair labor practice section as mentioning "periodic dues". It argues:

"\* \* \* If we apply the rule of statutory construction which holds that different words appearing in the same statute are presumed to have different meanings, then quite clearly 'periodic dues' cannot have the same meaning as 'regular dues'. Since 'periodic' in common usage may mean either 'intermittent' or regular, we must assume that 'periodic' in Section 8(a)(3) means intermittent. Since the well established meaning of the word 'dues' is a 'fee or charge required for membership' and compulsory assessments are nothing but intermittent charges required for membership, the term 'periodic dues' must embrace compulsory assessments."

The Board and the Union agree that the terms "periodic" and "assessment"

---

6. Ballentine, Law Dictionary 413 (1948 ed.); Black, Law Dictionary 590 (4th ed.).

7. Virginia Electric & Power Co. v. National Labor Relations Board, 319 U.S. 533, 541, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); Merion Cricket Club v. United States, 315 U.S. 42, 43, 62 S.Ct. 430, 86 L.Ed. 656 (1942).

8. Fresh Meadow Country Club v. United States, 17 F.Supp. 400, 401 (E.D.N.Y. 1936). Actually the definition is quoted from Thompson v. Wyandanch Club, 70 Misc. 299, 127 N.Y.S. 195, 199.

9. Arbitration Award of Leonard E. Lindquist, *Bemis Bros. Bag Co.*, 14 Labor Arbitration Reports 685, 687.

10. AFL–CIO, Union Security 7 f.f. (1958), quoted in Bakke, Kerr, Anrod, Union Management and the Public, 106–107 (2 ed. 1960).

11. Labor Management Relations Act (Taft-Hartley Act), 29 U.S.C.A. § 151 et seq. (1947). Section 9(f)(5) required reports of the "regular dues" while Section 9(f)(6)(d) required a detailed statement of the procedure for levying "assessments". These sections were repealed by the Labor-Management Reporting and Disclosure Act of 1959 Section 201(d) but were reenacted with substantially the same requirements in Sections 201(a)(4) and 5(B). It is interesting that in reenactment of the now Section 201(a)(4) the language was changed from "the regular dues or fees" to "the regular dues or fees or other periodic payments". There appears to be no explanation for the change in either the Hearings or in the Reports to Congress. The *Official Reporting Form LM-1*, line 7d, indicates that only recurrent fees need be listed to satisfy the reporting requirement, as it is in the following form: $—— per ———. The blank following the word "per" is to be filled in with: "month, year, etc." as indicated in line 7c. Lab.Rel.Rep., LRX 7103.

are not defined in the Act and hence they should be given their usual and ordinary meanings. The Union observes that the definition of the word "periodic" may mean "at regular intervals" or "occurring from time to time, recurrent, intermittent" from which it reasons that periodic dues can include an "intermittent" assessment.

It is clear that the term "periodic dues" in the usual and ordinary sense means the regular payments imposed for the benefits to be derived from membership to be made at fixed intervals for the maintenance of the organization. An assessment, on the other hand, is a charge levied on each member in the nature of a tax or some other burden for a special purpose, not having the character of being susceptible of anticipation as a regularly recurring obligation as in the case of "periodic dues". On the basis of semantics the Union's definitions of "periodic dues" are not persuasive that the term includes assessments.

The Union also points to Section 302 of the Act which provides that it is a criminal violation for the employer to pay or agree to pay anything of value to the Union except for checkoff of "membership dues" (as against the term "periodic dues" used in Section 8(a)(3)) where a valid authorization has been signed by the employee.[12] The Department of Justice in an opinion has construed the term "membership dues" as used in Section 302 to cover "assessments".[13] The Board acquiesced in this view in so far as Section 302 is involved.[14] The Board submits that Section 8(a)(3) and 8(b)(2) contain different language than Section 302. In the former the pertinent words used are "periodic dues" and in the latter "membership dues". It contends that the term "membership dues" is susceptible of

12. The pertinent part of Section 302 provides:
"(a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce.
"(b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value.
"(c) The provisions of this section shall not be applicable * * *; (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization:
*Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner; * * *" 29 U.S.C.A. § 186.

13. The reference is to the memorandum of an Assistant Attorney General, dated May 13, 1948, in reply to a memorandum from an Assistant Solicitor General, enclosing a letter addressed to him by the Solicitor of the Department of Labor requesting an interpretation of Section 302. The pertinent portion of the memorandum reads
"Does the term 'membership dues' in Section 302(c) of the Act include initiation fees and assessments as well as regular periodic dues, particularly where the union constitution provides that such fees and assessments are included in the term 'membership dues'?
"This identical question was presented to the Criminal Division as the result of the National Bituminous Coal Wage Agreement of 1947 which contained a provision for the check-off of membership dues, including initiation fees and assessments of the United Mine Workers of America and its various subdivisions, as authorized and approved by the International Union, UMWA. In a memorandum, dated July 10, 1947, we furnished the Attorney General with our views on this question, stating that initiation fees and assessments, being incidents of membership, should be considered as falling within the classification of 'membership dues.' We are still of this view." 22 LRRM 46, 47 (1948).

14. International Harvester Co., 95 N.L. R.B. 730 (1951); William Wolf Bakery, Inc., 122 N.L.R.B. 630 (1958).

a broader interpretation.[15] The Board further urges that the sections involve completely different legislative policies; one pertaining to unfair labor practices and the other to criminal sanctions.

The Union's rejoinder is that the term "membership dues" is not subject to broader interpretation than "periodic dues"; that since "dues" means the charge for membership the qualifying term "membership" is surplusage; that "periodic dues", on the other hand, may be construed fairly to encompass any charge for membership and thus in terms of common usage one term is susceptible of no broader interpretation than the other.

The Union also points out that the House version [16] of Section 302 contained the words "dues, fees, assessments * *" and the Senate version referred to "membership dues" only, with the Senate version being enacted. Therefore the Union argues that on these facts alone it must be assumed that Section 302 prohibited the checkoff of assessments. The Union submits, if, despite this legislative history, the term "membership dues" has been construed (by the Department of Justice) to include assessments under the purview of Section 302 it is "surely perverse to insist that the term 'periodic dues' in Section 8(a)(3) has a narrower meaning." It suggests that this forces the conclusion that the term "periodic dues" must include "assessments".

Again we find the argument of the Union strained. Its play upon the words "membership dues" does not carry any weight. It appears to contend that the legislative history of Section 302 indicates that assessments were not intended to be within its scope but since the Department of Justice nevertheless has interpreted it to include assessments, Sections 8(a)(3) and 8(b)(2) should be

similarly construed based upon an erroneous interpretation given Section 302.

The position of the Board appears to be the more reasonable. In asquiescing in the interpretation by the Department of Justice of Section 302 for the purpose of its administration of that statute in its penal aspects the Board did not bind itself to a similar construction in the administration of Sections 8(a)(3) and 8(b)(2). Two different policies are brought into play, the operative effects of which create no conflict. Section 8(a)(3) prevents a union shop employer from discharging an employee at the request of the union unless he has reason to believe that only failure to pay uniform "periodic dues" or "initiation fees" is the sole cause of his lack of union membership, while Section 302, under the interpretation of the Department of Justice, permits an employer with a valid union security contract to deduct assessments, providing the employee has voluntarily signed an authorization as prescribed in the section. The broad construction granted in the administration of Section 302 by the Department of Justice is consistent with the criminal character of the sanctions it embodies. The narrow construction applied by the Board to the enforcement of Sections 8(a)(3) and 8(b)(2) is consistent with the overall protection afforded by those sections to employees and equally creates no inconsistency with the enforcement of Section 302 for it is completely extrinsic thereto.

Both the Board and the Union have made reference to the much publicized incident in which the famous moving picture producer and director, Cecil B. De Mille, figured, as discussed before the House and Senate Labor Committees.[17] His expulsion from a union for refusal to pay an assessment of one dollar to a fund to oppose a proposed anti-closed shop law in California was the subject

15. International Harvester Co., supra, note 14, at 733.

16. H.R. 3020 § 8(a) (2) (C), 80th Cong., 1st Sess. (1947).

17. Hearings on Bills to amend the National Labor Relations Act, 80th Cong., 1st Sess., 1140; Hearings on S. 55, 80th Cong., 1st Sess., 797. See also Sen.Rep. No. 105 on S. 1126, 80th Cong., 1st Sess. 6–7, 1 Leg.Hist. 412–413.

of comment during the discussions on the bill. The Board cites a statement of Senator Ellender that the amendments would protect from discharge "a man called upon to put up a contribution to fight a cause in which he did not believe." The Board views this expression and others which it cited as illuminating the intent of Congress not to extend the power to discharge beyond the failure to pay periodic dues.

The Union contends the discussion manifested no alarm over the discharge of Mr. De Mille for refusal to pay the compulsory assessment, but concern because "the union took Mr. De Mille's job away from him solely because he refused to contribute to a *political* cause with which he was not in sympathy." However, no strong focus upon the legislative intent as it affects assessments of the kind under consideration in this case is produced by this or other instances offered by either the Board or the Union out of the debates in Congress. In fact there is no clear or specific guide in the legislative history of Sections 8(a)(3) and 8(b)(2) as to whether the Congress intended that strike assessment should be regarded as within the term "periodic dues", the failure of the payment of which could cause the discharge of an employee.

The Union compares the 1951 Amendments to the Railway Labor Act [18] to the legislation in question here. In the former, union security agreements were sanctioned and discharge was permitted only "for failure of the employee to tender the periodic dues, initiation fees, and *assessments* * * *."[19] (Emphasis added.) The Union submits that Senator Taft considered this provision identical with Section 8(a)(3),[20] as did Senator Hill [21] and that the Senate Committee adopted Senator Taft's views.[22] The

Board argues that such a change in wording could only mean a different intent and that in the hearings on the Railway Labor Act as proposed [23] it was stated that the term "assessments" was used to meet the situation of the railway unions, some of which required the payment of only nominal dues, but heavy monthly assessments.[24]

It is true as stated by the Union that during the discussion of the Railway Labor Act Amendments Senator Taft commented:

> "* * * I objected to some of the original terms of the Bill, but when the proponents agreed to accept amendments which made the provisions *identical* with the Taft-Hartley Law, I was willing to concur in those amendments." (Emphasis supplied.) 96 Congressional Record 16267, 81st Cong., 2d Sess.

It is also true that Senator Hill and the Senate Committee stated their conclusions to be that the Railway Labor Act Amendments are generally in accord with those of the Labor Relations Management Act.

In Machinists v. Street, 367 U.S. 740, 765–766, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) the Court takes occasion to advert to the House and Senate Hearings on the Railway Labor Amendments, as follows:

> "* * * The original proposal for authorization of the union shop was qualified in only one respect. It provided 'That no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member * * *.' This was primarily designed to prevent dis-

---

18. 45 U.S.C.A. § 152 Eleventh (b) (1951).

19. Ibid.

20. Citing 96 Cong.Rec. 16267, 81st Cong., 2d Sess. (1950).

21. Ibid. at 15736.

22. Sen.Rep.No.2262 on S. 3295, U.S.Code Cong.Service, 81st Cong., 2nd Sess.1950, p. 4321.

23. Cited in International Ass'n of Machinists v. Street, 367 U.S. 740, 765–766, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961).

24. Ibid.

charge of employees for nonmembership where the union did not admit the employee to membership on racial grounds. See House Hearings, p. 68; Senate Hearings, pp. 22–25. But it was strenuously protested that the proposal provided no protection for an employee who disagreed with union policies or leadership. It was argued, for example, that 'the right of free speech is at stake * * *. A man could feel that he was no longer able to freely express himelf because he could be dismissed on acount of criticism of the union * * *.' House Hearings, p. 115; see also Senate Hearings, pp. 167–169, 320. Objections of this kind led the rail unions to propose an addition to the proviso to § 2, Eleventh to prevent loss of job for lack of union membership 'with respect to employees to whom membership was denied or terminated for any reason other than the failure of the employee to tender the periodic dues, fees, and assessments uniformly required as a condition of acquiring or retaining membership.' House Hearings, p. 247. Mr. Harrison presented this text and stated, 'It is submitted that this bill with the amendment as suggested in this statement remedies the alleged abuses of compulsory union membership as claimed by the opposing witnesses, yet makes possible the elimination of the "free rider" and the sharing of the burden of maintenance by all of the beneficiaries of union activity.' House Hearings, p. 253. Mr. Harrison also sought to reassure Committee members as to the possible implications of other language of the proposed bill; he explained that 'fees' meant 'initiation fees,' and 'assessments' was intended primarily to cover the situation of a union which had only nominal dues, so that its members paid 'an assessment to finance the activities of the general negotiating committee * * * it will vary

month by month, based on the expenses and work of the committee.' P. 257. Or, he explained, an assessment might cover convention expenses. 'So we had to use the word "assessment" in addition to dues and fees because *some of the unions collect a nominal amount of dues and an assessment month after month to finance part of the activities, although in total it perhaps is no different than the dues paid in the first instance which comprehended all of those expenses.*' P. 258. * * *" (Emphasis supplied.)

Thus it is clear that the word "assessments" had a particular connotation in the adoption of the Railway Labor Act Amendments not generally applicable to Section 8(a)(3). Certainly no similar discussion occurred in the history of that measure expanding "periodic dues" to include assessments.

It appears safe to assume that Senator Taft's remarks and the related comments cited by the Union were directed at acceptance of the Railway Labor Act amendments in so far as they were generally similar in principle to the provisions of the Act and did not reach the level of fine distinctions between "assessments" and "periodic dues" as those terms are stated in the respective statutes.

The Board has held consistently that the term "periodic dues" does not include assessments and in at least two instances Courts of Appeals have recognized such findings. In Electric Auto-Lite Co., et al., 92 N.L.R.B. 1073 (1950), a petition for enforcement was granted per curiam, 196 F.2d 500 (6 Cir.1952), cert den. 344 U.S. 823, 73 S.Ct. 23, 97 L.Ed. 641 (1952). There an employer and the union were held to have violated Sections 8(a)(3) and 8 (b)(2) respectively. The employee was discharged at the request of the union because of his failure to pay charges for non-attendance at union meetings. The union argued that a charge of 50 cents per month, remitted upon attendance at meetings, was

part of the monthly dues of $2.00, but the Board held it to be a penalty and a fine.

In International Harvester Co., 95 N.L.R.B. 730 (1951) the security clause of the union contract provided for maintenance of membership to the extent of current monthly dues, general assessments and initiation fees. General assessments, even though uniformly levied, were held not to be "periodic dues".

In Anaconda Copper Mining Co., 110 N.L.R.B. 1925 (1954) the union considered increasing its monthly dues from $3.00 to $3.50, but instead voted to leave the dues at $3.00 per member each month and pay $1.00 each quarter as a "defense fund assessment * * * making dues $10.00 per quarter". It was held that the Act does not forbid the union from demanding money in addition to "periodic dues" but that it was prevented from requesting the discharge of an employee who refused to pay the additional charge.

In National Labor Relations Board v. Die and Tool Makers Lodge No. 113 et al., 231 F.2d 298 (7 Cir.1956), cert den. 352 U.S. 833, 77 S.Ct. 50, 1 L.Ed.2d 53 (1956), enforcement was granted of an order of the Board finding that the discharge of employees for failure to pay union dues was an unfair labor practice where the union refused to accept tendered dues until the "voluntary donation" assessed by the union had been paid. The assessment, as here, was for a fund to support fellow union workers in another company who were on strike. The union in that case admitted that it violated Section 8(b)(2) if it refused the valid tender of dues thereby causing employees to be discharged for reasons other than non-payment of dues. The claim of the union and the company was that the evidence was not sufficient to sustain the Board's finding that the discharge was for the non-payment of the strike assessment, and the case turned, therefore, on that issue of fact.

National Labor Relations Board v. International Association of Machinists, Guided Missile Lodge 1254, 241 F.2d 695 (9 Cir.1957) was another case in which the union's agreement with the employer provided that as a condition of employment of any member of the union the employee must pay "initiation fees, monthly dues and general assessments." The Board contended "that the agreement to pay assessments was not an agreement to pay dues and hence the assessment provision was unlawful." It further contended that the invalid assessment provision was so interwoven with the valid provision for discharge for the nonpayment of dues that it tainted the latter provision. The court agreed that "assessments" are not "dues", but that they were "clearly different and separable". It concluded that the invalid assessment provision did not invalidate the provision for discharge for failure to pay dues.[25]

25. A decision in this court in National Labor Relations Board v. Bakery & Confectionery Wkrs., 245 F.2d 211 (3 Cir. 1957) also dealt with circumstances related to this case. There a union bylaw provided that failure to pay union dues on or before the last day of the month rendered a member liable to a charge of a one dollar assessment and discharge would result if the delinquent dues and one dollar assessment were not paid by the 15th of the following month. Such a charge was held not to be a "part of the dues structure" by the Board in The Great Atlantic and Pacific Tea Co., 110 N.L.R.B. 918. After that decision the union amended its bylaws by increasing the monthly dues by the sum of one dollar but if the dues were paid on or before the last day of the month the member was entitled to a discount of one dollar. The Board majority held that the discount procedure produced the same results as the union's former assessment scheme. On petition for enforcement of the Board's order the court framed the issue in the following question: "Can the respondent union's discount plan, which on its face contemplates merely the payment of periodic dues uniformly required, be reasonably interpreted to impose a fine or assessment?" 245 F.2d at 214. In answering in the negative it was held that the record contained affirmative evidence that the union discount procedure was intended not as a punishment but "rather as a real inducement and reward for the prompt payment of monthly dues." Enforcement was denied.

The circumstances in each of the above cases may vary in some respects from those in the present case, yet they are not so dissimilar as to prevent the emergence of a pattern revealing consistency in the holding of the Board that assessments in any of their various forms may not be included within the term "periodic dues". The Board apparently sought in each to support a policy of protecting the employee from discharge except for failure to pay "periodic dues and initiation fees", strictly interpreting those terms as they appeared in Sections 8(a)(3) and 8(b)(2).

From the point of view of the Union the Board's narrow construction of the terms frustrated the purpose of the sections which it contends was to support the policy of eliminating the enjoyment of union benefits by "free riders". It poses in illustration the situation of an employer and a union reaching an impasse in collective bargaining negotiations and a point wherein the union is in great need of funds without which its bargaining power would be seriously imperiled. In this hypothetical case it is to be assumed that compliance with the constitution and bylaws of the union would make an increase in the dues structure impractical from the standpoint of time. It urges that such a contingency creates a vital requirement in the nature of the cost of union representation and that under such circumstances it should be empowered to require all employees in the union to contribute to the essential strike fund as a condition of employment.

It is the position of the Board that the Union may not, under the Act, enforce the payment of such an assessment under pain of discharge, but it maintains that the Union is still left with substantial internal powers. It suggests that under Section 8(b)(1)(A) of the Act

" * * * the Union could take appropriate steps to enforce its demands, so long as these steps remained matters confined to internal union administration and did not 'determine the right of a member to the acquisition or retention of a job.'

N.L.R.B. v. Philadelphia Iron Works, 211 F.2d 937, 940–941 (C.A. 3)."

In that case this court went as far as to assume that expulsion from the union was within its power.

We are confronted with divergent policy considerations as they arise out of the application of the statutory terms. The Union advances as more compelling its theory that union security is insured by the power of the Union to compel discharge for the non-payment of dues inclusive of mandatory assessments uniformly levied on all members while the Board contends that it is of paramount importance that only the non-payment of "periodic dues and initiation fees" to the exclusion of assessments of the type mentioned in this case shall constitute the criterion upon which discharge from employment for non-union membership may be enforced.

The Board has reached its determination after a consideration of the usual and normal meaning of the words and the history and purposes of the legislation. That determination "is to be accepted [by the reviewing court] if it has 'warrant in the record' and a reasonable basis in the law." National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Unemployment Compensation Comm. of Territory of Alaska v. Aragon, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946) and see National Labor Relations Board v. Coca-Cola Bottling Co., 350 U.S. 264, 269, 76 S.Ct. 383, 100 L.Ed. 285 (1956). The views of the Board are not contrary to any clearly expressed legislative intent and are totally reasonable. Hence its determination that the term "periodic dues" as used in Sections 8(a)(3) and 8(b)(2) does not encompass the strike assessment levied by the Union against its members must be upheld.

The arguments presented by the Company are generally encompassed by those of the Union and require no treatment other than those accorded herein to the latter.

The majority of the Board ordered the Company to cease and desist from threat-

ening to discharge, or otherwise to discriminate against, any employees if they do not pay strike or other assessments to the Union, and from, in any like or related manner, interfering with, restraining or coercing its employees in the exercise of their rights under Section 7 of the Act except to the extent "that the same may be permitted by the proviso to Section 8(a) (3) of the Act as modified by the Labor Management Reporting and Disclosure Act of 1959."

It also ordered the Union to cease and desist from attempting to cause the Company to discharge or otherwise discriminate against any employees in its Branch 6 if they do not pay strike or other assessments to the Union; from making the above threats to any of said employees and from, in any like or related manner, restraining or coercing any of said employees in the exercise of their rights under Section 7 with the same exception as applied in the case of the Company.

In order to effectuate the policies of the Act both the Company and the Union jointly and severally were ordered to reimburse the employees in all stores of Branch 6 for payments of the strike assessment made in whole or in part after November 3, 1959. They were directed to take action implementing the Board's order by way of making their records available; posting appropriate notices and forwarding required notifications.

The Company and the Union take the position that even if the determination of violations of the Act are upheld, restitution is not justified for payments made after November 3, 1959 to employees of all stores in Branch 6, but only to those of the Bergenfield and Teaneck stores.

It is true that the memorandum of November 3, 1959, addressed to the managers of all the stores in Branch 6, communicated no threat of discharge on its face. However, Mr. Borland had been

informed by Mr. Johnston that the Union would demand the discharge of those employees who failed to pay the assessment. Mr. Borland had told employees that if the checkoff was determined to be proper the Company would have no other course than to comply with the Union agreement and discharge those who did not pay it if so requested by the Union. Other Company and Union officials also urged employees to pay the assessment or risk discharge. So a foundation was laid for the memorandum of November 3rd. The declaration it contained as to the acceptance by the Company of the propriety of the checkoff of the strike assessment could only mean that failure to pay it would render the defaulter open to the risk of discharge should the Union demand such action.

The Company and the Union contended that there is no evidence that the memorandum was ever communicated by managers of the stores to their respective employees who did not pay the assessments other than in Bergenfield and Teaneck. There is, in fact, no testimony by a manager or employee of any store other than those in Bergenfield or Teaneck. However, it was clear that Mr. Borland felt that he had a problem in many of the stores [26] wherein employees had not paid, and that he had made the position of the Company plain to some managers and employees of stores other than those in Bergenfield and Teaneck on his routine visits to them. There was no reason to assume that the Union intended to press only the employees of the Bergenfield and Teaneck stores for payment. On the contrary, the assumption that it was avid for every employee in every store to acquit himself of the obligation of the strike assessment is a logical one. There was sufficient evidence to justify the Board's finding that the activities demonstrated at the Bergenfield and Teaneck

26. Mr. Borland testified that there were 1600 members of the Union in the 58 stores. The record does not show unpaid assessments prior to November 3, 1959. It does disclose that 138 owed all or part of the assessment prior to the latter part of January 1960. In 17 stores, all had paid in full. In each of 15 stores only one had held out. Fifty dissenters were to be found in five stores. The remaining 21 stores averaged somewhat over three unpaid members.

stores were typical of the attitude of the Company and the Union toward the employees in all of the stores of Branch 6 who had failed to pay the assessment after November 3, 1959.

The Board was justified in finding that the non-paying employees in all of the stores were aware of the position of the Company and the Union on the necessity of instituting the checkoff after November 3rd and of the consequence of discharge that could follow failure to make payment.

The majority of the Board, in approving the findings of the Examiner, regarded without distinction the authorizations permitting the deduction of "membership dues" which are older in point of time from the newer authorizations permitting the deduction of "monthly dues * * * and assessments."[27] It conceded that the "term 'membership dues' as distinguished from 'periodic dues' embraces assessments. * * *" It concluded that the authorization cards were never relied on by the parties; that the Company's decision to comply with the Union's demand to checkoff hinged on the security provision of the Union contract rather than on whether the authorizations permitted the checkoff and that the form of authorization "bears no weight in the determination of the litigated issue."

■ It held that, in any event, the authorizations had been revoked by the employees' "uproar" against the proposal to deduct the assessment. It also observed that in some of the authorizations it was provided that they would remain in effect for the term of the contract or one year, whichever is the lesser, unless revoked in writing by the employee 15 days prior to each contract anniversary date. Since the contract was not introduced in evidence the specific term of the contract was not disclosed and the ques-

tion of the application of the notice of 15 days was not ascertainable. Consequently it found that the Company and the Union were faced with adverse inferences because they elected not to offer the contract in evidence. Furthermore it noted that during the opposition of the employees to the checkoff of the assessment no point had been made that the authorizations were not revoked in writing and therefore the claim could not be raised then.

Notwithstanding the findings of the majority members the question of whether *all* are entitled to restitution still remains an issue, as raised by the minority member. In his dissent he agreed with the finding of the majority that the Company and the Union made threats that violated the Act. However, he disagreed with the majority that the issue may be decided on threats alone or that the authorizations of employees for the deduction of membership dues and assessments are immaterial or had been revoked.

He noted that, as the majority of the Board had pointed out, the Department of Justice had interpreted Section 302 as meaning that an authorization permitting the checkoff of "membership dues" may lawfully cover assessments as well as initiation fees and dues and that the Board in William Wolf Bakery, Inc., 122 N.L.R.B. 630 (1958) had determined that as a matter of comity it would follow the interpretation of the Department of Justice as to Section 302. Therefore he submits that to hold "because Section 8 (a)(3) bars discrimination for failure to pay assessments, any conduct designed to collect assessments is *ipso facto* an unfair labor practice, even though such collection is pursuant to an authorization valid under Section 302." is to "render the rights granted to employers and unions by Section 302 wholly illusory; it would make unlawful under Section 8(a)(3)

27. The evidence disclosed that some employees had signed cards authorizing the deductions of "membership dues" in specific amounts of $2 and $2.50 per month. Others had authorized deductions of "membership dues" of $2.50 and $3.00 per month "and initiation fees of $20.-00". Still other cards authorized the deduction of "regular monthly union dues, initiation fees and any assessments" without specifying amounts.

that which is lawful under Section 302." The dissenting member reasoned that "assuming the existence of valid authorizations, there would have been no violation by either Respondent if there had been no threats and the Respondent Company had merely complied with the Respondent Union's request for the checkoff of the strike assessment; for in such a case the Respondents would have done no more than the employees had voluntarily agreed they might lawfully do, and there is nothing in the Act making such conduct an unfair labor practice." He concluded that the unlawful threats required no different result and that he did not believe "that action which is lawful in itself becomes unlawful merely because the Respondents, misapprehending their legal rights, resorted to independently unlawful conduct in an effort to coerce the employees to permit them to do what they already independently had a right to do."

He held in the case of those employees who had limited their authorizations to the deduction of a specific amount of monthly dues, the deduction of the strike assessment was unlawfull, in view of the coercion of the Company and the Union, and they should be reimbursed for all such assessments after November 3, 1959.

As to those employees who had voluntarily executed cards authorizing the deduction "of any assessments", he held they should not be entitled to reimbursement because the deduction was pursuant to a valid current checkoff authorization and did not violate the Act. He disagreed with his colleagues that these authorizations had been revoked by the alleged "uproar" of the employees against the proposed checkoff and point-

ed out that no employee sought to revoke in writing his authorization pursuant to the provisions contained therein.[28]

The majority of the Board in a footnote to its decision denied that its holding was based on an assumption that any conduct designed to collect assessments is *ipso facto* an unfair labor practice, insisting that the checkoffs in this case were held unlawful because they were exacted from employees as a condition for their continued employment independent of the outstanding authorizations.

The majority of the Board maintained that the decision in William Wolf Bakery, Inc., supra, "merely held that a check-off authorization which included assessments was not on its face in conflict with Section 302 of the Act."

In Local 60, United Brotherhood of Carpenters and Joiners of America, AFL-CIO v. National Labor Relations Board, 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961) the Supreme Court held:

"The Board has broad discretion to adapt its remedies to the needs of particular situations so that 'the victims of discrimination' may be treated fairly. See Phelps Dodge Corp. v. [National] Labor [Relations] Board, 313 U.S. 177, 194 [61 S.Ct. 845, 85 L.Ed. 1271]. But the power of the Board 'to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act.' Consolidated Edison Co. [of New York] v. [National] Labor [Relations] Board, 305

28. The authorizations in question contained the following provision regarding revocation:
"* * * This authorization shall continue in effect for the term of this contract, or one year, whichever is the lesser, and shall continue in effect from contract year to contract year unless revoked in writing by the undersigned to the company and the Union fifteen days prior to each contract year anniversary date. It is understood that the company's responsibility for the performance of this service is strictly limited to the delivery of such dues, assessments, and initiation fees to the Retail Food Clerks Union, Local 1245."
The opinion of the Department of Justice, 22 L.R.R.M. 46–47 (1948) approved a provision similar to the foregoing.

U.S. 197, 236 [59 S.Ct. 206, 83 L.Ed. 126]. Where no membership in the union was shown to be influenced or compelled by reason of any unfair practice, no 'consequences of violation' are removed by the order compelling the union to return all dues and fees collected from the members; and no 'dissipation' of the effects of the prohibited action is achieved. [National] Labor [Relations] Board v. [District 50, United] Mine Workers, supra [355 U.S.] 463 [78 S.Ct. 392, 2 L.Ed.2d 401]. The order in those circumstances becomes punitive and beyond the power of the Board."

■ We think that the guidance reflected in the above decision supports the view of the dissenting member that those employees who voluntarily signed authorizations permitting the checkoff of "membership dues, initiation fees and assessments" are not entitled to reimbursement as ordered by the majority. Under Section 302 the Company, at the request of the Union, could have made a valid checkoff of the assessment, where proper authorization by the employees permitted it, and some of the authorizations in this case were so made.

There is nothing to support the holding of the Board that the authorizations, otherwise valid, were revoked by the "uproar" of the employees, for their revocation can be accomplished only in accordance with the provisions contained therein.[29] The "uproar" could not be substituted for the required notice in writing and the notice in writing could not be excused because the Union contract was not offered in evidence by the Company or the Union to show its anniversary date. All the parties and the Board agreed that a union contract with security provisions existed and it should have been as easily accessible, at the demand of the General Counsel of the Board, as any of the other subpoenaed documents which were produced.

■ The threats constituting the violations of Sections 8(a)(3) and 8(b)(2) were independent of the voluntary authorizations. Sanctions aimed at the threats may be imposed for the purpose of preventing recurrence of similar conduct. In fact the majority of the Board properly ordered such by way of injunction to restrain a repetition of the proscribed conduct and the posting and mailing of appropriate notifications by the Company and Union. A breach of the restraint could bring on contempt charges, an effective measure to achieve compliance with the Act. However, the restitution of the assessment to employees who had voluntarily authorized the checkoff would return to them that which they had validly authorized to be deducted. This would exceed the power of the Board which has been held to be limited to "recreate the conditions and relationships that would have been had there been no unfair labor practice."[30]

In the case of those employees whose authorizations only permitted the deduction of "membership dues" limited in amount (to $2.00, $2.50, or $3.00) the majority of the Board has ignored the limitation. Membership dues restricted in amount may not be given the same broad interpretation to cover assessments as the unqualified term "membership dues." Where there were deduc-

29. See note 28, supra.

30. In Local 60, United Brotherhood of Carpenters and Joiners of America v. National Labor Relations Board, 365 U. S. 651, 657, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961), Mr. Justice Harlan in his concurring opinion said:

"* * * The Board has been told that it is without power to 'effectuate the policies of this Act' by assessing punishments upon those who commit unfair labor practices. Republic Steel Corp. v. [National] Labor [Relations] Board, 311 U.S. 7, 11, 12, [61 S.Ct. 77, 85 L.Ed. 6]. The primary purpose of the provision for other affirmative relief has been held to be to enable the Board to take measures designed to recreate the conditions and relationships that would have been had there been no unfair labor practice. Consolidated Edison Co. [of New York] v. [National] Labor [Relations] Board, 305 U.S. 197, 236, [59 S.Ct. 206, 83 L.Ed. 126]."

tions for the assessment, under color of those authorizations, restitution of the sums deducted after November 3, 1959 is warranted.

The enforcement of the order of the majority of the Board will be granted with the modifications indicated herein.