AMOUNT REQUESTED:    $112,281.56
AMOUNT DEDUCTED:    39,406.50
AMOUNT AWARDED:    $ 72,875.06

**PACIFIC NORTHWEST NEWSPAPER GUILD, LOCAL 82, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 88–1626.

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1989.

Decided June 16, 1989.

Hugh Hafer, Seattle, Wash., with whom David S. Barr, Washington, D.C., was on the brief, for petitioner.

William A. Baudler, Atty., N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B. and Howard E. Perlstein, Supervising Atty., N.L.R.B., Washington, D.C., were on the brief for respondent.

Before MIKVA, EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The National Labor Relations Act permits collective bargaining agreements that require employees in a bargaining unit to pay union dues and initiation fees, but such

agreements may not oblige employees to pay "assessments." The National Labor Relations Board concluded that petitioner Pacific Northwest Newspaper Guild, Local 82 violated sections 8(b)(1)(A) and 8(b)(2) of the National Labor Relations Act by attempting to cause the Seattle Times, pursuant to a collective bargaining agreement, to discharge two of its employees. The Board held the union's actions to be an unfair labor practice because they were precipitated by the employees' refusal to pay "assessments" to the union rather than "periodic dues." We believe that the Board, in distinguishing dues and assessments in this case, has not adequately reconciled its decision with its own precedent, and we therefore remand the case to the Board for further consideration and explanation.

## I.

█ Congress, by enacting the Taft-Hartley Act, outlawed the closed shop, under which union membership at the time of hiring was a condition of employment. *See* 29 U.S.C. § 158(a)(3) (1982). The Act, however, did not prohibit union-security agreements such as the union shop, whereby employees can be required to become members of the union once employed, or the agency shop, which requires non-union employees to pay the union the equivalent of periodic dues and initiation fees required of union members. *NLRB v. General Motors Corp.*, 373 U.S. 734, 741, 743–44, 83 S.Ct. 1453, 1458, 1459–60, 10 L.Ed.2d 670 (1963). Congress recognized that if unions were not permitted to negotiate for such agreements, unions would not be able to deal with the free-rider problem of employees benefiting from collective bargaining without assuming any obligation to finance its

costs. S. REP. No. 105, 80th Cong., 1st Sess. 6 (1947). But whether or not a union-security agreement nominally requires "membership," it may lawfully do no more than impose limited financial obligations on employees, *i.e.*, that they pay initiation fees and uniform periodic dues. *See NLRB v. Food Fair Stores, Inc.*, 307 F.2d 3, 14 (3d Cir.1962). The "membership" that can be required as a condition of employment is thus "whittled down to its financial core." *NLRB v. General Motors*, 373 U.S. at 742, 83 S.Ct. at 1459.

█ This dispute grows out of a variable dues structure set forth in the Guild's constitution. Since 1972, article XVII of the constitution has provided that the Guild's local affiliates shall require all members to pay either monthly "reduced dues" or "regular dues." Approximately seventy percent of the time since 1972, Guild members were required to pay the so-called "reduced dues" (five percent of weekly compensation plus $1.50), which went to the Guild's General Fund. The constitution also provides, however, that if a separate International Defense Fund (IDF), which principally finances benefits to striking or locked-out Guild members and other expenses incidental to strikes and lockouts,[1] falls below $4,500,000, the Guild will charge higher "regular dues," (8.2 percent of weekly compensation plus $1.50). The difference in amount between the "regular dues" and the "reduced dues," according to the constitution, is deposited in the International Defense Fund, and once the IDF reaches $6 million, the Guild returns to a "reduced dues" period.[2] That occurred only irregularly between 1972 and 1987.

1. The IDF has also been used for purposes unrelated to strikes and lockouts, such as loans and grants to locals affiliated with the Guild, loans to the Guild's General Fund, severance pay liability to Guild employees, and contributions to unions not affiliated with the Guild.

2. The Guild previously described contributions to the IDF as "assessments," but adopted the "reduced" and "regular" dues terminology in 1972 after deciding that the "assessment" label was a misnomer. We cannot fault the union for putting emphasis on terminology since the

Board in the past has distinguished between dues and assessments based on the apparent fortuity of the union's designation. *See Anaconda Copper Mining Company*, 110 N.L.R.B. 1925, 1926 (1954) (quarterly payment that was periodic, uniformly levied, and used for purpose of meeting union's general financial obligations was nonetheless classified as assessment, primarily because union membership termed it an "assessment" and entered it into its books as an "assessment").

The first three times the IDF fell below $4,500,000 after the 1972 constitutional amendment, the "regular dues" were charged automatically. The membership thus paid the higher dues from May 1972 through March 1973; March through May 1976; and September 1978 through April 1981. The IDF fell below the minimum threshold a fourth time in late March or early April 1985, but the Guild's officials decided not to increase the members' dues payments at that time because the union's annual convention was scheduled for two months hence. In June, the delegates to the convention voted to impose the higher "regular dues" effective August 1985, until the IDF again reached $6 million. At the same time, the constitution was amended to provide that for one time only, when the IDF reached $6 million, the monthly dues would remain at the higher "regular dues" level for an additional month, with the additional income to be used to fund the Guild's severance pay liability to its staff.

Local 82 and the Seattle Times are parties to a collective bargaining agreement that contains a union security agreement, providing that if any member of the Guild falls one month behind in the payment of dues, the Seattle Times, upon formal notice from the union, shall terminate his employment. The unfair labor practice charge underlying the General Counsel's complaint was filed by a Seattle Times employee in the bargaining unit, Kenneth Johnston. Johnston and another employee, Tonya King, in 1981 resigned their "memberships" in the union, but nevertheless continued to pay the "reduced dues." When the Guild levied the "regular dues" on its members in August 1985, Johnston and King objected that the difference in amount between regular and reduced dues constituted "special assessments," which they were not obliged to pay. The union responded that if the two employees refused to pay the full amounts, it would request the Seattle Times to discharge them pursuant to the terms of the union-security agreement. Although they eventually paid the additional amounts through February 1986 (including the month devoted to severance pay) under protest, John-

ston filed an unfair labor practice charge seeking a refund and an order restraining the union from seeking to cause their dismissal on these grounds. The Board's General Counsel subsequently issued a complaint.

To determine whether the payments were periodic dues or assessments, the ALJ applied the definitions employed by the Third Circuit in *NLRB v. Food Fair Stores, Inc.*, 307 F.2d 3, and later adopted by the Board in *Local 959, International Brotherhood of Teamsters (RCA Service Co.)*, 167 N.L.R.B. 1042, 1045 (1967):

> "[P]eriodic dues" in the usual and ordinary sense means the regular payments imposed for the benefit to be derived from membership to be made at fixed intervals for the maintenance of the organization. An assessment, on the other hand, is a charge levied on each member in the nature of a tax or some other burden for a special purpose, not having the character of being susceptible as a regularly recurring obligation as in the case of "periodic dues."

*Food Fair Stores*, 307 F.2d at 11.

The ALJ concluded that the difference in amount between the "regular dues" collected by the union from August 1985 to January 1986 and the normal "reduced dues" was an assessment and not periodic dues, because it was "levied on each member in the nature of a tax ... for a special purpose, not having the character of being susceptible of anticipation as a regularly recurring obligation."

He cited several factors to support his conclusion: the dues increase was for the "special purpose" of paying the expenses incurred by locals through strikes and lockouts; the extra money was placed in a special fund, separate from the main treasury; the increased dues were levied "irregularly and at irregular intervals;" and it was impossible for members to anticipate the implementation and duration of the dues increases. The Board affirmed the ALJ's findings and conclusions, but it disavowed any reliance on the purposes for which the increased dues payments were expended.

The ALJ (and Board) also held that the additional month (February 1986) of "regular dues" devoted to severance pay for Guild employees was an assessment. This increase—independent of the imposition of "regular dues" keyed to the IDF—was held to be a "special one-time assessment designed to meet an emergency situation." It thus did not fit within the *Food Fair Stores* definition of "periodic dues," because it was not a regularly recurring obligation.

## II.

The Board, notwithstanding its adoption of the *Food Fair Stores* standard, has had great difficulty in drawing a clear line between periodic dues and assessments. To categorize charges, it has held that "dues may be required from an employee under a union-security contract so long as they are periodic and uniformly required and are not devoted to a purpose which would make their mandatory extraction otherwise inimical to public policy." *Detroit Mailers Union No. 40*, 192 N.L.R.B. 951, 952 (1971). The ALJ in this case classified the charges as assessments because they were not periodic and were devoted to a special purpose.[3] But, as noted, the Board disclaimed any reliance on the purpose for which the charges were levied and thus avoided confronting what the ALJ described as "hopelessly irreconcilable" precedent on that issue.[4] According to the Board then, the difference in amount between the Guild's "regular dues" and "reduced dues" was an assessment because the charges were not periodic, as defined in *Food Fair Stores.*

Despite the Supreme Court's recent reiteration that the courts of appeal must defer, under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to a Board interpretation of ambiguous statutory language so long as its construction is "rational and consistent with the statute," *NLRB v. United Food & Commercial Workers*, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987), the Board has not asked us for *Chevron* deference. Perhaps that is because the Board's application of the terms "periodic dues" and "assessments" has been so inconsistent and inadequately explained as not to warrant deference. *See id.* 108 S.Ct. at 421 n. 20. To be sure, the Board avoided the need to confront its "hopelessly irreconcilable" precedent elaborating the "purpose" prong of *Food Fair Stores* by not relying on that part of the ALJ's opinion. But we think the Board's conclusion that the "regular dues" were not periodic also fails to explain coherently its prior precedent.

On several occasions, the Board has sanctioned a variable dues formula as legitimately within the meaning of periodic dues. In *Local 409, International Alliance of Theatrical State Employees (IATSE)*, 140 N.L.R.B. 759 (1963), the union levied one-and-a-half percent of its members' gross earnings per month (in addition to a fixed sum of $6.75 per quarter), provided the members were "working at the trade."[5] Although the amount paid varied with a member's income and with his employment status, the Board concluded that the levies were periodic dues. *Id.* at 764. The Board has also classified as periodic dues amounts charged that depend on the prompt payment of dues, *Local 1345, International Assoc. of Machinists*, 157 N.L.R.B. 1020, 1022 (1966) (25–cent discount for prompt payment of monthly dues), or on attendance at union meetings, *Local 171, Assoc. of Western Pulp & Paper Workers,*

---

**3.** The ALJ rejected the General Counsel's contention that the charges were not "uniformly required."

**4.** In *Local 959, International Brotherhood of Teamsters*, 167 N.L.R.B. 1042, 1045 (1967), the Board held that charges are "periodic dues" only if levied for the purpose of supporting the union as a collective bargaining agent. Later, without overruling *Teamsters*, it ruled that a purpose is inconsistent with periodic dues only if it is "in-imical to public policy." *Detroit Mailers Union No. 40*, 192 N.L.R.B. at 952.

**5.** Members were considered to be "working at the trade" if they were engaged in work that fell within the "work jurisdiction" of the union; these would include projectionists, operators, or sound technicians. A member employed solely as a checker in a supermarket was not required to pay the percentage levy. 140 N.L.R.B. at 761.

165 N.L.R.B. 971, 972 (1967) (two dollar refund of dues to members who attended union meetings). The ALJ "distinguished" these cases from the Guild's variable dues structure by merely declaring that "these situations differ significantly from the situation posed by the instant case." We may approve a curt explanation if the path of the agency's reasoning is clear, *see Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), but even the most diffident reviewing court cannot accept that bald an assertion when the reasons for the distinction are not readily apparent.

The Board's counsel, to be sure, tried valiantly to salvage the agency's position and offered several explanations for the Board's decision. Counsel argued that the Guild's variable charges are not periodic dues, because it is impossible to anticipate with any degree of certainty when the IDF will fall to a level requiring imposition of "regular dues," nor can a member predict how long the higher dues will remain in effect. The problem we see with this argument is that it applies equally to those cases in which the Board has ruled that charges levied pursuant to variable dues structures constitute periodic dues. A union member could not predict or even control, for example, the amount of time that he is "working at the trade," *see Local 409, IATSE,* 140 N.L.R.B. at 761, and even the best student of biorhythms could not foresee whether a future illness would preclude his attendance at a union meeting. *See Local 171, Assoc. of Western Pulp & Paper Workers,* 165 N.L.R.B. at 972. Conversely, it might be thought that an observant member of the Guild would have at least a good idea when "regular dues" could be imposed in the future by monitoring the level of the IDF and the relationship between labor and management at the

various local sites.[6] The Board's opinion does not even attempt to explain how the variable dues in its earlier cases are any more susceptible of anticipation than the Guild's "regular dues." [7]

Counsel also pointed to the ALJ's observation that one cannot be sure the Guild will institute the dues increase even if the IDF falls below the threshold of $4,500,000, because the Guild's board once postponed the dues increase (in June 1985) despite the IDF's decline below the triggering amount. It is unclear from the ALJ's opinion, however, whether he found this element dispositive, so we need not decide whether it would be sufficient. The ALJ's decision, as adopted by the Board, seems to be based on his conclusion that the higher dues are instituted irregularly and unpredictably—reasoning we reject above as inadequately distinguishing Board precedent—and we may not affirm a formal agency adjudication on grounds other than those used by the decision-maker itself. *Federal Power Comm'n v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974).

■ The Board's treatment of the additional one month of "regular dues," imposed in February 1986 to fund the Guild's severance pay liability to its employees, stands on firmer footing than its discussion of the recurrent regular dues. No matter how the Board reconciles its cases concerning variable dues structures, we think the Board may fairly classify a one-time charge like the February levy as an assessment rather than periodic dues. An isolated collection of funds is not a recurring obligation, let alone a regularly recurring one susceptible of anticipation. The Board has previously labeled such levies as assessments. *United Assoc. & Journeymen & Apprentices of the Plumbing & Pipe-*

---

6. In its brief, the Board states that Local 82's members "do not appear to be regularly informed about the defense fund's reserves," but points to nothing in the record to substantiate that assertion or show why such information is necessarily unavailable.

7. Nor can the Board's decision be upheld on the grounds that the extra money derived from reg-

ular dues is placed in a special fund rather than the Guild's general treasury. This rationale seems closely related to the "special purpose" reasoning that the Board disavowed, and, moreover, the Board has previously held that charges deposited in separate special purpose funds can constitute "periodic dues." *Detroit Mailers,* 192 N.L.R.B. at 951–52.

 

*fitting Industry, Local No. 81,* 237 N.L.R.
B. 207, 210 (1978).

\* \* \* \* \* \*

We full well recognize that what we demand of the Board—a coherent reconciliation of its own precedent as applied to this case—is not easy. But if the Board's order is to be enforced it must be based on an adequate explanation of why the union's conduct violated the law. If the Board wishes to draw an interpretative distinction between anticipatable and unpredictable charges, it must do so under a legal theory that permits a union reasonably to "predict" whether a particular practice will be lawful or not. Otherwise, we sanction impermissible "ad hocery" on the part of the Board which is the core concern underlying the prohibition of arbitrary or capricious agency action.

We therefore grant in part the Board's cross-petition for enforcement and remand to the Board for further explanation of its decision concerning the "regular dues" collected from August 1985 to January 1986.

*It is so ordered.*