**ATARI GAMES CORPORATION, Appellant,**

v.

**Ralph OMAN, Register of Copyrights.**

No. 88–5296.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1989.

Decided Oct. 31, 1989.

A. Sidney Katz, with whom James P. White and Laurie A. Haynie, Chicago, Ill., were on the brief, for appellant.

Nathan Dodell, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, R. Craig Lawrence, Asst. U.S. At-

tys., Dorothy Schrader, General Counsel, and William Roberts, Washington, D.C., Atty., Copyright Office, were on the brief, for appellee.

Before RUTH BADER GINSBURG, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

Opinion concurring in the judgment filed by Circuit Judge SILBERMAN.

RUTH BADER GINSBURG, Circuit Judge:

By letter dated December 7, 1987, the Copyright Office reported its final action refusing to register a claim to copyright in the video game BREAKOUT, an audiovisual work created in 1975 by Atari, Inc., the predecessor of plaintiff-appellant Atari Games Corporation (Atari). The December 1987 letter, written on behalf of the United States Register of Copyrights (Register), stated that the video game in question "does not contain sufficient original visual or musical authorship to warrant registration." Invoking the judicial review prescriptions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, Atari unsuccessfully challenged the agency's determination in the district court as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[1]

In this appeal from the district court's entry of summary judgment for the Register, we hold that the Copyright Office did not intelligibly account for its ruling. Because we are unable to determine on the current record whether the Register's action comports with the demand of reasoned decisionmaking, we vacate the district court's judgment and remand the case to that court with instructions to return the matter to the Copyright Office for further consideration consistent with this opinion.

I. Background and Prior Proceedings

BREAKOUT, the audiovisual work that is the subject of this dispute, is a coin-operated, ball and paddle video game created in 1975 and successfully marketed by Atari in the following years.[2] BREAKOUT's audiovisual display features a wall formed by red, amber, green, and blue layers of rectangles representing bricks. A player maneuvers a control knob that causes a rectangular-shaped representation of a paddle to hit a square-shaped representation of a ball against the brick wall. When the ball hits a brick, that brick disappears from its row, the player scores points, and a brick on a higher row becomes exposed. A "breakout" occurs when the ball penetrates through all rows of bricks and moves into the space between the wall and the top of the screen; the ball then ricochets in a zig-zag pattern off the sides of the screen and the top layer of the wall, removing bricks upon contact and adding more points to the player's score. Various tones sound as the ball touches different objects or places on the screen. The size of the paddle diminishes and the motion of the ball accelerates as the game is played.

By letter dated February 5, 1987, Atari sought expedited registration of a copyright claim in the audiovisual work embodied in BREAKOUT. Atari asserted an "urgent need for special handling because of prospective litigation in which [Atari] would be acting as plaintiff." *See infra* note 3. The Copyright Office responded promptly, but unfavorably. By letter dated February 13, 1987, Copyright Examiner Carmen Martorana declared the work not copyrightable. She reasoned that "[t]o be considered an audiovisual work for registration purposes, the work must contain related pictorial or graphic images, and at

---

1. *See* 17 U.S.C. § 701(d) (specifying that most actions taken by the Register of Copyrights are subject to the provisions of the Administrative Procedure Act).

2. Copyrights registered in June 1983 in the home version of BREAKOUT and in the arcade game SUPER BREAKOUT were not timely brought to the attention of the district court and form no part of the record before this court. *See Atari Games v. Oman,* No. 88–0021 (D.D.C. Aug. 18, 1988) (memorandum order denying motion for reconsideration).

least one of those images must be copyrightable." BREAKOUT did not qualify, she wrote, because neither the "[c]ommon geometric shapes ... contained in th[e] work" nor "the coloring of th[o]se shapes" constituted copyrightable subject matter. Similarly, she stated, "[t]here is not enough original authorship to register a claim in the sounds." She further said that the "images ... created by playing the video game ... are also not registrable since they are created randomly by the player and not by the author of the video game."

By letter dated May 22, 1987, Shirley B. Wendell of the Examining Division denied reconsideration. She repeated that the common geometric shapes contained in BREAKOUT are not copyrightable, that adding color did not render the work copyrightable, and that "[t]he individual tones or sounds are not copyrightable."

By letter dated December 7, 1987, Harriet L. Oler, Chief of the Examining Division, denied further reconsideration and announced the agency's final action on the claim. She initially stated that the Register views the work "as a whole" to determine whether registration is warranted. However, to explain her conclusion that BREAKOUT "does not contain sufficient original visual or musical authorship to warrant registration," she separately treated the work's several parts:

[T]he use of a symbol for a wall drawn in a familiar tile type design is not copyrightable. The same is true of the image of a rectangle used in place of a paddle, a circle [sic] for a ball, and a common four colored stripe embellishing the wall.

The game's sounds, she added, "the three tones used before the ball, and the string of double tones used after it," do not "constitute any copyrightable audio authorship." She further stated that the arrangement of the "stationary screen display" contains no copyrightable authorship because "so few items" appear on the screen and "the arrangement is basically dictated by the functional requirements of this or similar backboard type games." Finally, she noted, Atari was not precluded "from

registering a claim in the computer program."

Atari sought court review of the agency's final action. On cross-motions for summary judgment, the district court concluded that the Register reasonably applied controlling law to the facts before him. Describing the three letters from the Copyright Office as "thoughtful and well-orchestrated" expositions of the "pertinent considerations," the court held that the Register did not abuse his discretion in treating BREAKOUT as one of the "rare" instances of expressive value so slight as to be insufficient for copyright purposes. *Atari Games Corp. v. Oman*, 693 F.Supp. 1204, 1206, 1207 (D.D.C.1988).

## II. The Significance of Registration in this Controversy

Section 410 of the Copyright Act, 17 U.S.C. § 410, provides in part:

(a) When, after examination, the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited constitutes copyrightable subject matter and that the other legal and formal requirements of this title have been met, the Register shall register the claim and issue to the applicant a certificate of registration under the seal of the Copyright Office....

(b) In any case in which the Register of Copyrights determines that, in accordance with the provisions of this title, the material deposited does not constitute copyrightable subject matter or that the claim is invalid for any other reason, the Register shall refuse registration and shall notify the applicant in writing of the reasons for such refusal.

If registration is refused, the applicant may seek immediate judicial review, as Atari did here, in an action under the Administrative Procedure Act, 5 U.S.C. §§ 701–706. *See* 17 U.S.C. § 701(d). Alternatively, as noted in the Register's final decision, determination of the copyrightability of the work may be sought in the context of an infringement suit.

Section 411(a) of the Copyright Act, 17 U.S.C. § 411(a), permits an infringement

suit, despite the Register's refusal to register a copyright claim, if registration submissions to the Copyright Office were in proper form and the Register is notified so that he may exercise a right to intervene. *See Nova Stylings, Inc. v. Ladd,* 695 F.2d 1179 (9th Cir.1983) (holding mandamus no longer available to compel registration). Registration carries evidentiary weight in an infringement suit. Registration before or within five years after first publication of the work constitutes prima facie evidence of the validity of the copyright; registration after the five-year period may be accorded weight "within the discretion of the court." 17 U.S.C. § 410(c). For Atari, then, registration of a copyright in BREAKOUT might have evidentiary force in an action against an alleged infringer[3] and would assure against the Register's appearance in the infringement action as a party adverse to Atari on the issue of registrability.

### III. Appellate Measurement of the Register's Action

Regarding the district court, our review stance in this case is not deferential:

> Because an award of summary judgment reflects "a determination of law rather than fact," we do not defer to the District Court's conclusions but consider the matter de novo.

*Nepera Chem., Inc. v. Sea–Land Serv., Inc.,* 794 F.2d 688, 699 (D.C.Cir.1986) (quoting *Liberty Lobby v. Anderson,* 746 F.2d 1563, 1572 (D.C.Cir.1984), *vacated on other grounds,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). We accord due respect, however, to decisions made by the Copyright Office pursuant to authority vested in the Register by Congress. Accordingly, we review the Register's decision under an "abuse of discretion" standard. *See John Muller & Co. v. New York Arrows Soccer Team, Inc.,* 802 F.2d 989, 990 (8th Cir.1986); *Norris Indus., Inc. v. International Tel. & Tel. Corp.,* 696 F.2d 918, 922 (11th Cir.), *cert. denied,* 464 U.S.

818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983); *Esquire, Inc. v. Ringer,* 591 F.2d 796, 806 n. 28 (D.C.Cir.1978), *cert. denied,* 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). For the reasons stated below, we are unable to discern from the final agency action disqualifying BREAKOUT for registration just how the Register is applying the relevant statutory prescriptions. We therefore return the case for the requisite rational explanation. *See, e.g., Fort Bragg Ass'n of Educators v. FLRA,* 870 F.2d 698, 701 (D.C.Cir.1989); *City of Vernon v. FERC,* 845 F.2d 1042, 1046–49 (D.C.Cir.1988).

We initially summarize our concerns; then, to facilitate the Register's further consideration, and guard against rudderless administrative pronouncements, we develop those concerns more fully. *See Pacific Northwest Newspaper Guild v. NLRB,* 877 F.2d 998, 1003 (D.C.Cir.1989) ("core concern" of court, when petitioned to check against arbitrary and capricious administrative action, is to assure that executive agencies hew to principled "legal theory" and do not indulge in "ad hocery"); *Kamargo Corp. v. FERC,* 852 F.2d 1392, 1398 (D.C.Cir.1988) (denial of permit is arbitrary and capricious unless the Commission has "acceptable legal support under its authorizing statute"). First, we note the Copyright Act's definition of "audiovisual works" as "a series of related images ... intrinsically intended to be shown by the use of ... devices such as ... electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects ... in which the works are embodied." 17 U.S.C. § 101 (definitions). Although the Act uses the phrase "a series of related images," the Copyright Office, even in its final action, emphasized the non-copyrightability of the work's several parts—the wall, paddle, ball, and tones—and also treated "the stationary screen display." *See supra* p. 880. We are at a loss to understand why the Register did not more solidly link the final decision to the Act's apparent recognition that the whole—the "series of related im-

---

**3.** Atari has instituted suit against an alleged infringer. *Atari Games Corp. v. Romstar,* No. 87 C 9504 (N.D.Ill.).

ages"—may be greater than the sum of its several or stationary parts.

Second, we do not grasp the standard of creativity the Copyright Office employed in determining whether to register BREAK-OUT as an audiovisual work. Was it the normal standard under which a very modest degree of intellectual labor will suffice? *See, e.g., West Publishing Co. v. Mead Data Cent., Inc.,* 799 F.2d 1219, 1223 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); 1 M. Nimmer & D. Nimmer, Nimmer On Copyright § 1.08[C][1] (1989). Or did the Office test BREAKOUT against a higher standard, one resembling the "substantial creativity" measuring rod sometimes used to judge derivative works? *See* 17 U.S.C. § 103; *Chamberlin v. Uris Sales Corp.,* 150 F.2d 512, 513 (2d Cir.1945) (compilations or other derivative works must contain "some substantial, not merely trivial, originality"). And if an elevated creativity requirement was employed, what justified use of a heightened standard?

Third, the cryptic character of the final agency decision leaves us uncertain whether the action regarding BREAKOUT is consistent with earlier and later pronouncements of the Copyright Office and courts. Put more particularly, we are concerned that the Register may have confused or blended in this case the analytically and operationally separate questions: (1) is a work registrable as one constituting "copyrightable subject matter," *see* 17 U.S.C. § 410(a), (b); and (2) what is the extent of copyright protection—solid or thin—due a given "original work of authorship." The first question relates to the *existence* of copyright, the second, to the *scope* of protection.

### V. Copyrightable Subject Matter

■ "Copyright protection subsists ... in original works of authorship" including, among several categories of copyrightable subject matter, "audiovisual works." 17 U.S.C. § 102(a)(6). Video games, case law confirms, rank as "audiovisual works" that may qualify for copyright protection. *See, e.g., M. Kramer Mfg. Co. v. Andrews,* 783

F.2d 421, 436 (4th Cir.1986); *Midway Mfg. Co. v. Artic Int'l, Inc.,* 704 F.2d 1009, 1012 (7th Cir.), *cert. denied,* 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983); *Stern Elecs., Inc. v. Kaufman,* 669 F.2d 852, 857 (2d Cir.1982); *Midway Mfg. Co. v. Dirkschneider,* 543 F.Supp. 466, 479–80 (D.Neb. 1981).

This court and others have defined the word "original" in the Copyright Act's term "original works of authorship," 17 U.S.C. § 102(a), to mean "only that the work 'owes its origin to the author'—*i.e.,* that the work is independently created, rather than copied from other works." *Reader's Digest Ass'n v. Conservative Digest, Inc.,* 821 F.2d 800, 806 (D.C.Cir.1987) (quoting *Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 102 (2d Cir.1951)). As the district court stated, "[t]here is no dispute in this case, and the Register expressly recognized, that BREAKOUT originated with or was independently created by Atari." *Atari Games Corp.,* 693 F.Supp. at 1205.

■ While the Register concedes that BREAKOUT is an independent creation, he concluded that the game is not a "work of authorship" within the meaning of the statute. To constitute a "work of authorship," the material deposited with the Register must pass a "creativity" threshold, *i.e.,* it must embody "some modest amount of intellectual labor." *Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 668 n. 6 (7th Cir.1986) (distinguishing the concepts "originality," "creativity," and "novelty," and observing that "[f]or a work to be copyrightable, it must be original and creative, but need not be novel"), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987).

#### A. The focus of inquiry

■ The Register subjected BREAK-OUT to a component-by-component analysis, and considered in the aggregate "the stationary screen display." *See supra* p. 880; *see also* Brief for Appellee at 11 (arguing that BREAKOUT "does not qualify for copyright because the *components* of the audiovisual display are not original

works of authorship") (emphasis added). The Act, however, uses the definitional term "series of related images," 17 U.S.C. § 101, and the case law correspondingly indicates that the Register's focus, even if initially concentrated on discrete parts, *ultimately* should be on the audiovisual work as a whole, *i.e.*, the total sequence of images displayed as the game is played. *Stern Elecs.*, 669 F.2d at 857 ("Assessing the entire effect of the [video] game [SCRAMBLE] as it appears and sounds, we conclude that its repetitive sequence of images is copyrightable as an audiovisual display."); *see also* 113 CONG. REC. 8587–88 (1967) (Congressman Poff) ("A series of related images includes any group of two or more images having some type of relationship in their subject matter which gives unity to the group as a whole. However, the fact that some or all of the individual images in the group would also constitute separate works does not prevent the group of images from being an audiovisual work.").

In the clarification forthcoming on reconsideration by the Copyright Office, we anticipate that the Register will take careful account of our recent opinion in *Reader's Digest*, 821 F.2d at 806, in which we observed: [4]

> None of the individual elements of the Reader's Digest cover—ordinary lines, typefaces, and colors—qualifies for copyright protection. But the distinctive arrangement and layout of those elements is entitled to protection as a graphic work.... Reader's Digest has combined and arranged common forms to create a unique graphic design and layout. This design is entitled to protection under the Copyright Act as a graphic work.

*See also Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 388 (5th Cir.1984) (component parts "neither original to the plaintiff nor copyrightable" may, in combination, create a "separate entity [that] is both original and copyrightable"); *Roth Greeting Cards v. United Card Co.*, 429

F.2d 1106, 1109 (9th Cir.1970) (greeting cards held to be copyrightable although textual matter standing alone was not copyrightable; "all elements of each card, including text, art work, and association between art work and text, [must] be considered as a whole").

**B. The creativity threshold**

The level of creativity necessary and sufficient for copyrightability has been described as "very slight," "minimal," "modest." *See, e.g., West Publishing Co.*, 799 F.2d at 1223; *Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409, 411 (2d Cir.1970), *cert. denied*, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971); 1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT §§ 1.08[C][1], 2.01[B][1] (1989). In defense of the judgment that BREAKOUT does not pass the "modest" creativity threshold, appellate counsel for the Register pointed to the Copyright Office regulation providing that "familiar symbols or designs" and "mere variations of typographic ornamentation, lettering or coloring" are not subject to copyright. 37 C.F.R. § 202.1. Again, we are concerned that the Register's attention may have trained dominantly on components, not on the work as a whole—the full "series of related images." 17 U.S.C. § 101 (defining "audiovisual works"); *see supra* pp. 879–80, 882–83.

Furthermore, we note that simple shapes, when selected or combined in a distinctive manner indicating some ingenuity, have been accorded copyright protection both by the Register and in court. *See, e.g., Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.*, 490 F.2d 1092, 1094 (2d Cir.1974) (concluding that fabric design consisting of strip of crescents with scalloping or ribbons and rows of semicircles "constitutes modest but sufficient originality so as to support the copyright"); *Tennessee Fabricating Co. v. Moultrie Mfg. Co.*, 421 F.2d 279, 282 (5th Cir.) (holding that filigree pattern of intercepting

**4.** On brief, the Register correctly commented that *Reader's Digest* should not be read to hold that "anything submitted to the Copyright Office for registration which contains more than one

figure or object would be *per se* copyrightable." Brief for Appellee at 15. The court in that case spoke of a "distinctive arrangement," one that "create[s] a unique graphic design."

straight and arc lines "possessed at least the minimal degree of creativity required for a copyright"), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1819, 26 L.Ed.2d 91 (1970); *Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.,* 409 F.2d 1315, 1316 (2d Cir. 1969) (treating as subject to copyright protection fabric design consisting of a circle within a square within a circle); *In Design v. Lynch Knitting Mills, Inc.,* 689 F.Supp. 176, 178–79 (S.D.N.Y.) (upholding copyright of rhomboid pattern on a sweater), *aff'd,* 863 F.2d 45 (2d Cir.1988). We are thus uncertain whether or how the Register's decision on BREAKOUT harmonizes with prior Copyright Office actions and court rulings on the creativity threshold.[5]

■ In its brief on appeal, the Copyright Office compared Atari's claim for protection of its work "as a whole," to the protection copyright law affords to compilations and other derivative works. Brief for Appellee at 14. Derivative works, several decisions state, to be copyrightable, must meet a test of "substantial," not merely "minimal," creativity. *See, e.g., Past Pluto Prods. Corp. v. Dana,* 627 F.Supp. 1435, 1441 (S.D.N.Y.1986). To our knowledge, however, neither the Copyright Office nor any court has ranked as "derivative" a video game that, like the BREAKOUT game Atari produced in 1975, is not based on prior models. *Cf. M. Kramer Mfg. Co.,* 783 F.2d at 428 (request for registration as a derivative work of video game building on prior models).

We recall here the suggestion initially made by the Copyright Office that BREAKOUT's images are created "by the player and not by the author of the video game." *See supra* pp. 879–80. We are mindful, however, of the cogent exposition of our sister circuit regarding another video game:

> Although there is player interaction with the machine during the play mode which causes the audiovisual presentation to change in some respects from one game to the next in response to the player's varying participation, there is always a repetitive sequence of a substantial portion of the sights and sounds of the game, and many aspects of the display remain constant from game to game regardless of how the player operates the controls.

*Williams Elecs., Inc. v. Artic Int'l, Inc.,* 685 F.2d 870, 874 (3d Cir.1982); *accord Midway Mfg. Co.,* 704 F.2d at 1012 ("The player of a video game does not have control over the sequence of images that appears on the video game screen.... The most he can do is choose one of the limited number of sequences the game allows him to choose.").[6]

**C. "Idea" or "expression," *scènes à faire,* and the distinction between registrability and scope of copyright protection**

Copyright protection extends only to "expression," not to "ideas." 17 U.S.C. § 102(b); *Mazer v. Stein,* 347 U.S. 201, 217, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954). The Register sees the two as merged in the

---

**5.** After oral argument, in response to the court's inquiry, the Copyright Office identified three instances, in addition to BREAKOUT, in which registration as an audiovisual work was denied to a video game: TIC TAC TOE (registration rejected Aug. 30, 1989), OCTASY (registration rejected Oct. 21, 1988), and DRAW POWER DOUBLE DOWN (registration originally rejected Aug. 26, 1983, final rejection after appeal, Aug. 12, 1989). Notice to the Court of Other Videogame Rejections by the United States Copyright Office (Sept. 27, 1989). Before this post-argument submission, the Copyright Office had not drawn the court's attention to any instance, other than BREAKOUT, of the Register's refusal to register a video game as an audiovisual work. The court cannot discern from the Notice whether the three audiovisual works now specified by the Copyright Office are comparable to BREAKOUT. Nor do we know why the screen displays in these cases were found to lack sufficient authorship. For example, we are not informed whether any of these submissions were derivative works based on prior models.

**6.** It now appears settled that video games can qualify as works "fixed in [a] tangible medium of expression." 17 U.S.C. § 102(a); *see M. Kramer Mfg. Co. v. Andrews,* 783 F.2d 421, 440–42 (4th Cir.1986); *Stern Elecs., Inc. v. Kaufman,* 669 F.2d 852, 855–56 (2d Cir.1982); A. LATMAN, R. GORMAN & J. GINSBURG, COPYRIGHT FOR THE NINETIES 87–88 (3d ed. 1989). *But cf. Stern Elecs.,* 669 F.2d at 857 (recognizing that there might be repeating sequences so simple and invariable, or insubstantial a part of the whole that copyrighting would not be warranted).

BREAKOUT game. BREAKOUT contains no expression, he maintains, separable from the game itself, and therefore does not qualify as copyrightable subject matter. Eleven months prior to the final agency action in this case, the Fourth Circuit declared "untenable" lump categorization of video games as "idea" rather than "expression." *M. Kramer Mfg. Co.*, 783 F.2d at 436–37.

The Fourth Circuit, in *M. Kramer Mfg. Co.*, acknowledged and distinguished precedent holding that when the subject matter allows for only a very limited manner of expression, the idea and its expression remain a unit, so that there is no copyrightable material. *Morrissey v. Procter & Gamble*, 379 F.2d 675, 678–79 (1st Cir.1967) (copyright does not extend to rules for "sweepstakes" type sales promotion contest).[7] But works in the computer's domain generally have not fit that bill, the *M. Kramer Mfg. Co.* panel observed. Instead, the variety of ways to perform the same function sustains the classification of such works as "expression." *M. Kramer Mfg. Co.*, 783 F.2d at 436 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1253 (3d Cir.), *cert. denied*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984)). *Compare Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir.1971) (rejecting infringement of registered copyright claim brought by manufacturer of jeweled pin in the shape of a bee; court held that idea of pin and its expression were inseparable, defendants were therefore free to copy the idea and, consequently, to produce a jeweled bee pin that looked like plaintiff's) *with Atari, Inc. v. Amusement World, Inc.*, 547 F.Supp. 222, 227 (D.Md.1981) (observing that "the idea of a video game involving asteroids is a much more general idea than the rather specific concept of a jewelled pin in the shape of a bee, and the former is capable of many forms of expression," *i.e.*, differently designed and combined symbols, movements, and sounds). *But cf. Stern Elecs.*, 669 F.2d at 857 (leaving open the issue whether "a sequence of images ... might contain so little in the way of particularized form of expression as to be only an abstract idea portrayed in noncopyrightable form").

In this light, we do not follow the Register's thought in describing BREAKOUT's arrangement as dictated by "functional requirements." *See supra* p. 880. Atari demonstrated that a large variety of "arrangements" or designs might have been devised in lieu of those featured in BREAKOUT, *i.e.*, in place of the objects represented (multi-colored brick wall, square ball, and shrinkable rectangular paddle), the sounds employed (their tones and duration), and the speed and artificial direction of the ball's movement. *See* Addendum to Reply Brief for Appellant; *Williams Elecs., Inc. v. Bally Mfg. Corp.*, 568 F.Supp. 1274, 1281 (N.D.Ill.1983) (observing that, unlike an arcade pinball game, the audiovisual aspects of a video game "are conceptually separable from its utilitarian aspects"); Patry, *Electronic Audiovisual Games: Navigating the Maze of Copyright*, 31 J. COPR. SOC'Y 1, 46 (1983) ("[E]ven the simplest game may have variations of sizes, shapes, sequences, colors and sounds.")

■ Nor can it convincingly be maintained that audiovisual display and computer program are so linked that it is necessary or sufficient for Atari to register a claim in the computer program. *Cf. supra* p. 880.[8] Registering a claim in the pro-

---

7. *But cf. NEC Corp. v. Intel Corp.*, 10 U.S.P.Q.2d 1177, 1179, 1989 WL 67434 (N.D.Cal.1989):
    [A]s a matter of practicality, the issue of a limited number of ways to express an idea is relevant to infringement, but should not be the basis for denying the initial copyright. The Register of Copyrights will not know about the presence or absence of constraints that limit ways to express an idea. The burden of showing such constraints should be left to the alleged infringer. Accordingly, in the absence of Ninth Circuit authority to the contrary, it is concluded that the relationship between "idea" and "expression" will not be considered on the issue of copyrightability, but will be deferred to the discussion of infringement.

8. Written computer programs are copyrightable as literary works. *See* 1 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 2.04[C] (1989).

gram would not securely protect "the series of related images," 17 U.S.C. § 101, for which Atari seeks an "original work of authorship" copyright seal. "[M]any different computer programs can produce the same 'results,' whether those results are an analysis of financial records or a sequence of images and sounds." *Stern Elecs.*, 669 F.2d at 855. "[W]riting a new program to replicate the play of [a video game] requires a sophisticated effort, but it is a manageable task." *Id.; see* Patry, 31 J. COPR. SOC'Y at 5 ("A knock-off manufacturer could ... write a computer program which would exactly replicate the audiovisual display but which would not replicate the underlying computer program. In such an event, the registration of the computer program ... would be ineffective since it is the audiovisual display which is sought to be protected.").

■ Even if BREAKOUT contains "expression," the Register additionally suggests, the symbols displayed are so ordinary and commonplace as to fail under *scènes à faire* analysis. The term *scènes à faire* refers to stereotyped expressions, "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Alexander v. Haley*, 460 F.Supp. 40, 45 (S.D.N.Y.1978). In *Atari, Inc. v. North Am. Phillips Consumer Elecs. Corp.*, 672 F.2d 607 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982), the court placed "[c]ertain expressive matter" in the video game PAC–MAN in a *scènes à faire* compartment. 672 F.2d at 616–17. But the panel in that case ultimately did not conclude that the expressions it treated as *scènes à faire* gained no copyright protection. Instead, the panel said that the items in question (maze, scoring table, tunnel exits, dots) should "receive protection only from virtually identical copying." *Id.* at 617. That statement indicates that "the *scènes à faire* doctrine

limits only the scope of a given material's protection, not its copyrightability." *Nash v. CBS, Inc.*, 691 F.Supp. 140, 144 (N.D.Ill. 1988).

We are unable to detect from the final decision before us the standard the Register is using to differentiate material that cannot constitute copyrightable subject matter and therefore should not be registered, from material that may be copyrightable, although perhaps meriting only "thin" protection when the character of its "expression" is tested in an infringement suit. *Cf. Continental Cas. Co. v. Beardsley*, 253 F.2d 702, 704 (2d Cir.) (distinguishing between the *existence* of copyright and its *scope*), *cert. denied*, 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958). Because neither the idea/expression dichotomy nor the *scènes à faire* doctrine, under the prevailing case law, reveals to us why BREAKOUT should rank as a work in which no copyright can exist, we are currently unable to approve the Register's decision under those rubrics.[9]

### Conclusion

For the reasons stated, we reverse the summary judgment entered by the district court. We remand this case to that court with instructions to return the matter of Atari's application to the Register for renewed consideration consistent with this opinion.

*It is so ordered.*

SILBERMAN, Circuit Judge, concurring in the judgment:

We are asked in this case to review the decision of the Register of Copyrights denying Atari's application for a registration in the audio-visual display accompanying its game BREAKOUT. The copyrightability of the display is an issue currently before the District Court for the Northern District of Illinois where Atari has brought

---

9. At oral argument a suggestion was made that games are *categorically* accorded distinctive treatment by the Register. *But cf.* Patry, *Electronic Audiovisual Games: Navigating the Maze of Copyright*, 31 J. COPR. SOC'Y 1, 56 (1983) ("It is true that electronic audiovisual games are

'games,' yet ... no matter how humble in originality, such games are still a protectible form of expression."). The final decision we are reviewing, however, did not say if or why games, as a category, are different, so we do not address that prospect.

an action against a putative infringer. *See Atari Games Corp. v. Romstar, Inc.*, Civil No. 87 C 9504. Because a registration would afford something of an evidentiary advantage in that suit, *see infra* at 879–880, Atari has chosen to pursue this petition for review simultaneously with the infringement suit.

I join the judgment of the court—remanding the case to the Register of Copyrights for adequate explanation—because I cannot determine confidently from the Register's December 7, 1987 letter, the final agency action, what standard the Office used to deny registration. I write separately because I think the majority opinion could be misinterpreted so as to confine improperly the Register's discretion on remand.

We must bear in mind that when we review the Register's determination to accept or reject an application for registration, we do not make a final decision on the copyrightability of the item. In fact, as the majority opinion recognizes, the Copyright Office's imprimatur is worth only a rebuttable presumption as to copyrightability in an infringement action. And as the government points out, the Copyright Office receives over a 100,000 applications every year. Every time the Register denies registration for too little creativity it cannot be expected to issue an opinion that compares with the learned offerings of my colleagues. I think that is why the courts have generally thought abuse of discretion to be the appropriate standard to review the Office's denial of a registration. Since the applicant can gain full judicial review of copyrightability in an infringement action, the costs of forcing too fine an analysis and too extensive an explanation of a denial of registration[1] are not worth the benefits—particularly when reviewing a question which has unavoidably subjective aspects such as how much creativity is

sufficient to force the Copyright Office to register a proffered work.

If, however, the Register wishes to make a *categorical* distinction between classes of works such as video games as compared to other offerings such as works of art, and that distinction is to be based on the Register's interpretation of the Copyright Act—which distinguishes between "idea" and "expression"[2]—his determination might even be subject to a somewhat stricter scope of review than abuse of discretion—but it would still be quite deferential. I refer, of course, to *Chevron*, which obliges us ordinarily to leave undisturbed a permissible or reasonable agency interpretation of a statute if Congress has not directly addressed the issue presented. *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the Register has adopted such an interpretation to govern his office's decisions on registration, that does not mean that the judiciary would be obliged to afford deference to that position in an infringement action, which, of course, is *not* a direct review of agency action governed by the Administrative Procedure Act. The Copyright Act is quite explicit as to the weight a registration decision is to be given in that kind of judicial proceeding. The Register's decision to grant a copyright merely constitutes *prima facie evidence* of the copyright's validity in any infringement action brought within five years of the works first publication (and only whatever weight the court deems appropriate for actions brought after that time), *see* 17 U.S.C. § 410(c); judicial review of questions of law, including the question of copyrightability, is otherwise entirely *de novo*. *See Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980).

It is unclear to me whether the Register has drawn a categorical distinction between idea and expression in this case. It was

---

1. The Register typically gives no explanation when the Office registers an offering; the Act requires an explanation if the Office denies registration. *See* 17 U.S.C. § 410(c).

2. 17 U.S.C. § 102(b) provides that:

In no case does copyright protection for an original work of authorship extend to any *idea*, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work. (emphasis added).

suggested at oral argument that if a still of any of the computer images that appear during the game of BREAKOUT were submitted to the Copyright Office as a work of art, a copyright would issue. In that form, perhaps, the Register would not dispute the presentation's creativity. But the Register is apparently more willing to reject video game displays as insufficiently creative and has done so, not only in the case of BREAKOUT, but also in several other instances that were brought to the court's attention. It would seem then, that the Copyright Office is using a different standard to determine the copyrightability of video games than it uses for other works—which it may well be entitled to do—but it has not explained what those standards are (if they are indeed different) nor how it applies them.

The only indication we have of how the Register justifies this divergent treatment is the statement in the December 7 letter referring to the arrangement of the few items on the screen (at any given moment) as "basically dictated by the functional requirements of this or similar backboard type games." The letter does not further explain what the Copyright Office means by that cryptic statement, but, in its brief, the government argues that "BREAKOUT represents no more than a videogame idea" and therefore is not protected under the copyright statute. *See* 17 U.S.C. § 102. The government's brief further states that "games have been particularly susceptible to copying under copyright because the core feature—the idea for the game—cannot be protected." The government thus seems to be suggesting—although it is by no means clear, even in its brief—that in distinguishing between unprotected ideas and protected expressions under the copyright statute (an obviously difficult analytical task) the Register adopts a somewhat different approach for games than it does for, let us say, a magazine cover. *Cf. Reader's Digest Ass'n v. Conservative Digest, Inc.,* 821 F.2d 800 (D.C.Cir.1987).

I have the impression from the letter and brief that what underlies the Register's position is the notion that works of art—for instance, a drawing of the Potomac River or even of simple geometrical shapes—are almost entirely "expression"; the "idea" element is insignificant, and the Register therefore, seems more readily to afford them registration. On the other hand, the Register apparently believes that a video game's fundamental character is its idea or concept, and the form of expression it takes may be less important. The geometric shapes that appear at any moment on the BREAKOUT screen, and the rather simple audio tones, under that approach, would be seen primarily as a function of the idea of the game rather than an independent attempt at expression. If this is what accounts for the Register's disparate treatment of video displays and works of art, it may or may not be a "permissible interpretation" of the Copyright Act by the Register of Copyrights. *See Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I cannot be confident that this is even the Register's view since it is only hinted at in the Register's letter and only marginally elaborated in the government's brief. For that reason, I believe the case should be remanded to the Copyright Office for adequate explanation of its decision, and therefore I join in the judgment of the court.

The primary problem I find in the majority's opinion is its implicit, if not explicit, expansion of the scope of our review of the Copyright Office's registration decisions. To be sure, the majority nominally accepts abuse of discretion as the proper standard—surely the most deferential form of judicial review of agency action that we can employ. But as far as I can determine, there is no connection between the majority's adoption of that standard and its further discussion of the issues in the case. The majority's holding, set forth at pages 881–882, is that the Register's explanation of his action was inadequate to afford judicial review. The majority has three questions as to the Register's letter: (a) did the Register treat the work as a whole or only its components? (b) did the Register employ the "normal" standard of creativity? and (c) is the Register's decision consistent with earlier and later pronounce-

ments of the Copyright Office [3] and courts? I agree, as I have already indicated, that the Register is quite unclear as to the standard of creativity he is applying, particularly whether he is employing a different standard for video games, and therefore I have no fundamental quarrel with the majority's decision to remand for further explanation on that point. *But see infra* at 890. But the majority's other concerns, though also phrased in terms of questions, seem to be points of disagreement rather than confusion. For instance, the majority's statement "we are at a loss to understand why the Register did not *more solidly* link the final decision to the Act's apparent recognition that the whole—the 'series of related images'—may be greater than the sum of its several or stationary parts," Maj.Op. at 881 (emphasis added), reflects a difference in emphasis, not judicial concern with agency inarticulateness. And when the majority says that it is "uncertain" whether the Register's decision is "consistent with earlier and later pronouncements of the Copyright Office *and courts*," Maj. Op. at 882 (emphasis added), it is implying, not an inability to understand the Register, but rather that the Register's position is vulnerable if it departs from some judicial interpretations—which sounds like at least a tentative view on the merits. Of course even a suggestion that the Register is barred from adopting an interpretation of the Copyright Act regarding video games that is inconsistent with the view expressed by certain courts (let alone some scholarly commentators) would be at odds with the abuse of discretion standard of review; it would more nearly resemble *de novo* scrutiny. If that is what the majority means to imply, it is, in my view, not good administrative law. Thereafter, the majority launches into a thoughtful discussion of copyright law which—whatever value it may have to copyright law aficionados—does not seem to relate directly to the narrow issue before us now and therefore could be misinterpreted.

In that regard, I find the majority's discussion of the Fourth Circuit's opinion about the application of the idea/expression distinction to video games expressed in *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421 (4th Cir.1986), a copyright infringement case (not cited by the parties), to be somewhat misleading, surely premature, and perhaps inapposite. There, the court of appeals rejected a district court suggestion that video games are *never* copyrightable. Although the court recognized that "it is sometimes difficult to distinguish between the two concepts of 'idea' and 'expression,'" and that "if there is only one way to express the idea, 'idea' and 'expression' merge and there is no copyrightable material," *see id.* at 436, it seemed to regard computer games as more expression than idea and therefore readily copyrightable. The Fourth Circuit was not, however, reviewing a determination made by the Register of Copyrights. It may well be that if this issue came to us as it did to the Fourth Circuit in *Kramer*, as an infringement action in which the court was not obliged to defer to an agency's action or interpretation, I would follow the Fourth Circuit's approach, but that hardly justifies a preemptive rejection of any other practice the Register may adopt. That the Fourth Circuit thought " 'untenable' " the categorization of the video game before it as " 'idea' " rather than " 'expression' " Maj.Op. at 884–885 (quoting *Kramer*, 783 F.2d at 436), does not necessarily preclude the Register from distinguishing video games from other submitted works on idea versus expression grounds. I believe that the proper course in the review of a registration decision is to allow the Register to present his interpretation of the idea/expression dichotomy—which he has not done clearly here, even in counsel's *post hoc* suggestions—before the court offers its own guidance.

Similarly, I find the court's discussion of the Register's "component-by-component analysis" of BREAKOUT to be a bit heavy-

---

**3.** It is not clear what the majority means by earlier and later "pronouncements" of the Copy-

right Office.

handed. In the December 7 letter, summarized fairly in the majority opinion, the Register denied registration because the pictorial and audio components of the game were too simple to pass the nontrivial test for creativity of authorship. I doubt there is any better way to say something is too simple than merely to assert it. When the Register tried to explain why it thought the pictorial and audio aspects of the game were insufficiently creative, it broke the game down into its components and analyzed each part. That leads the majority to conclude that the Office did not judge the work as a whole and therefore, the majority seems to imply, the Office ran afoul of the Copyright Act as interpreted by various courts of appeals. *See* Maj.Op. at 882 (quoting 17 U.S.C. § 101 which defines audio-visual displays as a "series of related images"); *see also* Maj.Op. at 883. The December 7 letter, however, asserts that the Register did judge the work as a whole. I do not think the Register can be faulted for analyzing each component of the work. In explaining how one determined the copyrightability *vel non* of an audio-visual display, it seems that one would inevitably discuss the components.

In much the same way, the majority appears to prescribe the proper standard of creativity that the Register should employ in assessing audio-visual displays. *See* Maj. Op. at 883–84. I agree, as I have said, that the Register was unclear as to what standard of creativity should be applied. But I do not think that the Register should be bound on remand to accept the creativity standard found to be "normal" or appropriate by certain courts of appeals

and by Professor Nimmer. *See* Maj. Op. at 881–82. If the Register believes that video games should have to meet a "substantial" rather than a "minimal" creativity threshold, and he adequately explains that interpretation, we would properly review the Register's decision by applying a reasonableness standard or an abuse of discretion standard, not by deciding merely whether it was consistent with the rulings of courts and the analysis of scholars.[4]

\* \* \*

I agree with the majority that we properly remand here because, in my view, the Register has not explained if or why it is employing a categorical distinction between the registrability thresholds for video game displays and other works. But we must be careful when we choose this procedural option not to make it a device to induce an agency to provide the explanation and the result we think correct. If improperly read, the majority opinion might have the effect of causing the Copyright Office to register virtually any offering. So far as I can determine, no court since 1941 has reversed a decision by the Register to deny an initial application for a copyright.[5] And it may well be that, as a practical matter, only denials are vulnerable to legal challenge.[6] If that is so, we should not create incentives to register, the effect of which we do not understand.

---

4. The Register is not necessarily bound by its previous decisions—subsequently upheld by various courts in *infringement* actions—granting copyrights to a number of fabric designs and a room divider consisting of simple geometric shapes. *See* Maj.Op. at 883–84. Since the Copyright Office is only required to explain why it rejects but not why it grants an application for a copyright, *see* 17 U.S.C. § 410(c), none of those decisions indicates why the Register decided to copyright those works or that the *Register* has interpreted the Copyright Act to demand a "minimal" creativity standard for registrability to be applied across the board to all submissions.

5. *See Bouve v. Twentieth Century-Fox Film Corp.,* 122 F.2d 51 (D.C.Cir.1941). But at that

time, the registration of copyrights was considered "a ministerial duty imposed upon him by the law...." *Id.* at 56.

6. Putative challengers to the grant of registration—such as the defendant in the currently pending infringement suit that apparently precipitated this unusual petition for review of a Copyright Office's registration decision—may not know of the Copyright Office's action in time to bring a suit under the Administrative Procedure Act. If, on the other hand, they do typically know in time, we may find more and more litigation shifting from infringement actions to challenges of registration decisions—which does not seem desirable.