*1148 SEYMOUR, Circuit Judge,
dissenting.
The majority holds the National Labor Relation Board’s interpretation of membership dues under section 302, 29 U.S.C. § 186(c)(4), is unreasonable and cannot be enforced. I disagree and therefore respectfully dissent.
I
Section 302 makes it a crime for money payments to pass between employers and unions[1] but provides various exceptions for payments related to legitimate business between those entities. Under one of these exceptions, section 302(c)(4),[2] employers may forward payments of “membership dues,” deducted pursuant to employees’ voluntary authorization cards, to the workers’ union.
The employees in this case are probationary employees in their first 90 days of employment. These employees paid permit fees pursuant to “checkoff’: they voluntarily signed cards authorizing their employer, Oklahoma Fixtures Company, to deduct the amount of the permit fees from their paychecks and forward this amount to the union. The issue in this case is whether Oklahoma Fixtures, by forwarding these employees’ permit fees to their union, engaged in criminal conduct as defined under section 302, or whether forwarding such payments constituted noncriminal conduct under the (c)(4) exception for “membership dues.”
This case has been appealed from the National Labor Relations Board (the Board). In construing “membership dues” under section 302, therefore, we must defer to the Board’s interpretation of that labor statute if the interpretation is “reasonably defensible.” See Holly Farms Corp. v. NLRB, 517 U.S. 392, 409, 116 S.Ct. 1396, 134 L.Ed.2d 593 (1996). The Board determined that the permit fees at issue here are “membership dues” under section 302. Oklahoma Fixture Co., 331 NLRB 145, 6-7 (2000). It reasoned that the Department of Justice, the Board itself, and numerous courts have consistently interpreted “membership dues” broadly to include initiation fees and other assessments of employees by their unions, as well as agency fees paid by nonmembers. It also determined that the permit fees are similar to dues, and noted that the probationary employees are members of the collective bargaining unit and therefore a legitimate subject of service fees for the union., On this basis, the Board concluded the permit fees are permissible “membership dues” under section 302.
The majority determines that the collective bargaining agreement (CBA) indicates the permit fees are not “membership dues” under section 302. It also holds that “membership dues” as used in section 302 is unambiguous and that this unambiguous meaning excludes these permit fees. Accordingly, it concludes the Board’s interpretation is unreasonable. As explained below, in my judgment the majority mis *1149 reads the CBA, disregards relevant case law, and misconstrues the labor statutes at issue here. Under a correct reading of these sources, the Board’s interpretation is much more persuasive than the majority’s and easily warrants our deference as a reasonable interpretation of section 302.
II
The majority begins its analysis of the statutory term “membership dues” by construing the CBA. Not only is the contractual meaning of that term largely irrelevant to our statutory interpretation issue, but in conducting this inquiry the majority also plainly misconstrues the CBA and labor law. The misreading of labor law, in particular, leads the majority to conclude, contrary to case law, that the CBA indicates the permit fees are 'not membership dues.
Examining what constitute “membership dues” under the CBA is misleading and unnecessary because it is the statute itself, not the CBA, that controls the meaning of “membership dues” under section 302. Similarly, inquiring who is a “member” of the union is also misleading. While the CBA here does determine who is required to be a member of the union, it is not true that only payments by actual union members are “membership dues” under labor statutes as they have been -interpreted by the Supreme Court. See NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963); see also Marquez v. Screen Actors Guild, Inc., 525 U.S. 33, 119 S.Ct. 292, 142 L.Ed.2d 242 (1998). In General Motors, the Court held that agency fees, which are payments by nonmembers as a service fee to the union for the benefits of representation, constitute “membership dues.” General Motors, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670. Although the Court was construing section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 186(a), other courts have held, for reasons I discuss below, that “membership dues” should be interpreted even more broadly under the statute at issue here, section 302, see Assoc. Builders & Contractors v. Carpenters Vacation & Holiday Trust Fund, 700 F.2d 1269, 1275 n. 6 (9th Cir.1983); Int’l Union of Mine, Mill & Smelter Workers, Local 515 v. American Zinc, Lead & Smelter Co., 311 F.2d 656 (9th Cir.1963) (hereinafter “American Zinc”); NLRB v. Food Fair Stores, Inc., 307 F.2d 3 (3d Cir.1962); Grajczyk v. Douglas Aircraft Co., 210 F.Supp. 702 (S.D.Cal.1962); see also Arroyo v. United States, 359 U.S. 419, 425, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959) (exceptions to section 302 should be broadly construed because the statute is a criminal one).
Having incorrectly decided to use the CBA as a basis for statutory interpretation, the majority proceeds to compound the problem by misreading the contract and misapplying labor law to conclude that the permit fees cannot be membership dues within the meaning of section 302. First, the majority states that under the CBA employees do not become union members until 90 days have passed. In fact, although employees are not required (as a condition of employment) to become members until their 91st day, they are not precluded from becoming members before that, as the company conceded at oral argument. The majority also mistakenly states that probationary employees are required to pay -the permit fees; however, these fees are voluntary and the company may deduct them only after employees submit voluntary authorization cards to this effect. The majority thus states that probationary employees are required to pay dues and are excluded from being union members, neither of which is cor *1150 rect.[3]
On the basis of this erroneous reading, the majority concludes the permit fees are impermissible, i.e., they are not “membership dues” under section 302(c)(4). Even if this interpretation of the CBA were correct, however, the majority would have determined merely that these fees might violate section 8(a)(3), which prohibits unions and employers from requiring employee payments as a condition of employment unless they are “membership dues.”[4] In that event, the fees might be impermis-sively coercive for employees. This has little to do with whether particular payments going to unions — whether compulsory on the part of employees or not — constitute illegal transfers under section 302. Thus, the majority’s analysis and conclusion are not only irrelevant, they are legally erroneous because they apply the principles from section 8(a)(3), a labor rights statute, to the interpretation of section 302, a criminal statute.
While both section 8(a)(3) and section 302 are labor statutes and both contain the term “dues,” the prescriptions, purpose, and previous interpretations of “dues” in each are not the same. Section 8 is aimed at protecting employees from union and employer coercion. Section 8(a)(3) prohibits compulsory unionism except for permitting CBAs to require employees to compensate unions for repre *1151 sentation. “Membership dues” has been interpreted narrowly under 8(a)(3) precisely because employees can be discharged for failing to pay union “membership dues.” Since 8(a)(3) grants unions this coercive power over workers’ employment, the term has been interpreted narrowly to limit the scope of that power.[5] See General Motors Corp., 373 U.S. at 740-43, 83 S.Ct. 1453 (Congress’s dual purposes in enacting 8(a)(3) were to eliminate the most serious abuses of compulsory unionism by abolishing the “closed shop,” while permitting union security agreements that ensured employees afforded representation were not “free riders”); Food Fair Stores, Inc., 307 F.2d at 15 (affirming Board’s position narrowly construing section 8(a)(3) because while “the Act does not forbid the union from demanding money in addition to ‘periodic dues’ ... it [i]s prevented from requesting the discharge of an employee who refuse^] to pay the additional charge.”).
In contrast, the term “dues” in section 302 has been interpreted broadly for two reasons. First, section 302 is unrelated to any coercive power of the employer or union over employees. As I have pointed out, the statute prohibits payments between employers and unions that do not fall under one of its exceptions. The purpose of the statute is to prevent corruption between unions and employers, not to cabin any coercive power of the union over employees because, unlike section 8(a)(3), *1152 section 302 affords the union (and the employer) no such power. See Arroyo, 359 U.S. at 425-26, 79 S.Ct. 864 (purpose of section 302 to prevent “corruption of collective bargaining through bribery of employee representatives by employers, [ ] extortion by employee representatives, and [ ] possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control.”).
Unlike compulsory dues permitted under 8(a)(3), which are involuntary, section 302(c)(4), allowing employers to convey membership dues to unions, relates to the voluntary procedure of checkoff. Because checkoff is permitted only pursuant to voluntary authorization cards, payments from employees may be forwarded only after the employees have agreed not only to have the fees deducted from their paychecks, but also to pay them in the first place. Thus, even if certain fees may not be required under 8(a)(3), they may still be voluntarily made and be a legitimate subject of checkoff under 302(c)(4). See, e.g., American Zinc, 311 F.2d at 659-60 (comparing permissible payments under sections 302(c)(4) and 8(a)(3)). Whether particular payments may be required as membership dues under 8(a)(3) is therefore an entirely separate issue from whether they are a permissible subject of checkoff under 302(c)(4). See, e.g., Food Fair Stores, Inc., 307 F.2d at 12 (construing 8(a)(3) differently from Section 302 “creates no inconsistency with the enforcement of Section 302 for it is completely extrinsic thereto.”); Grajczyk, 210 F.Supp. at 705-06 (holding that checkoff for agency fees does not violate section 302 but noting “[wjhether or not the agreement by which [checkoff for agency fees] was brought about is an unfair labor practice or otherwise unlawful is quite a different question ... ”).
The second reason “membership dues” in section 302 is interpreted broadly is because they constitute an exception to a criminal statute. Arroyo, 359 U.S. at 425, 79 S.Ct. 864 (construing section 302); Food Fair Stores, Inc., 307 F.2d at 12 (“The broad construction granted in the administration of section 302 by the Department of Justice is consistent with the criminal character of the sanctions it embodies.”). The Third Circuit explained the application of the differences between sections 302 and 8(a)(3) as follows:
In acquiescing in the interpretation of the Department of Justice of Section 302 for the purpose of its administration of that statute in its penal aspects the Board did not bind itself to a similar construction in the administration of Sections 8(a)(3) and 8(b)(2). Two different policies are brought into play, the operative effects of which create no conflict. Section 8(a)(3) prevents a union shop employer from discharging an employee at the request of the union unless he has reason to believe that only failure to pay uniform ‘periodic dues’ or ‘initiation fees’ is the sole cause of his lack of union membership, while Section 302, under the interpretation of the Department of Justice, permits an employer with a valid union security contract to deduct assessments, providing the employee has voluntarily signed an authorization as prescribed in the section. The broad construction granted in the administration of Section 302 by the Department of Justice is consistent with the criminal character of the sanctions it embodies. The narrow construction applied by the Board to the enforcement of section 8(a)(3) and 8(b)(2) is consistent with the overall protection afforded by those sections to employees and equally creates no inconsistency with the enforcement of Section 302 for it is completely extrinsic thereto.
*1153 Food Fair Stores, Inc., 307 F.2d at 12 (emphasis added).
Because of the differences between the statutes, the majority’s proposition that the permit fees here cannot be membership dues if they fail to meet, or appear to violate, the 8(a)(3) definition of compulsory membership dues misconstrues both the CBA and section 302. The prescriptions of 8(a)(3) for limiting compulsory unionism should not be applied to determine whether permit fees give rise to criminal conduct by Oklahoma Fixtures. Accordingly, the majority is in error in concluding that because probationary employees are not required to be members until their 91st day of employment, checkoff for the permit fees must violate section 302.
III.
After suggesting the CBA’s definition of member should guide our inquiry, the majority turns to the meaning of “membership dues” under the statute. The majority’s analysis turns on its conclusion that the term “membership dues” is plain and unambiguous. This conclusion is contrary to Supreme Court precedent, every other court that has considered the issue, and common sense. The term used in section 8(a)(3) is actually “periodic dues” paid for “acquiring or maintaining membership” rather than “membership dues” as used in section 302,[6] which provides one obvious reason the meaning of “dues” in the two statutes are not interchangeable. See, e.g., Food Fair Stores. Inc., 307 F.2d at 9-16 (construing “periodic dues” under 8(a)(3) to exclude strike assessments). The Supreme Court has stated on more than one occasion that the “dues” in section 8(a)(3) incorporates more than its literal meaning suggests. See Marquez, 525 U.S. at 46, 119 S.Ct. 292 (1998) (the statutory language of section 8(a)(3) “incorporates all the refinements that have become associated with that language.... To the extent that these interpretations are not obvious, the relevant provisions of § 8(a)(3) have become terms of art.... ”); General Motors Corp., 373 U.S. at 742, 83 S.Ct. 1453 (“[T]he 1947 amendments [to section 8] not only abolished the closed shop but also made significant alterations in the meaning of ‘membership’ for the purposes of union-security contracts.”). It seems highly unlikely that “dues” in section 8(a)(3) would encompass such non-obvious interpretations and refinements but “dues” in section 302 would not. Indeed, the Ninth Circuit has expressly held that the term “membership dues” in section 302(c)(4) is ambiguous. American Zinc, 311 F.2d at 660.[7]
The fact that periodic or membership dues have been construed narrowly in 8(a)(3), but broadly as an exception to section 302, or even that the term is construed differently in the two statutes at all, also strongly suggests its meaning is not plain. See Food Fair Stores, Inc., 307 *1154 F.2d at 11-13 (membership dues under 8(a)(3) does not include “assessments” even if section 302 does); cf. Schwartz v. Assoc. Musicians, Local 802, 340 F.2d 228 (2d Cir.1964) (tax assessed in addition to dues constitutes “membership dues” under section 302); American Zinc, 311 F.2d at 659 (section 302(c)(4) permits strike assessments); Grajczyk, 210 F.Supp. at 705-06 (“membership dues” under section 302 covers agency fees even if such fees might constitute an unfair labor practice). And of course, the fact that courts have concluded certain payments are covered under section 302 but not under section 8(a)(3) further suggests the meaning of membership dues is not straightforward. Compare Food Fair Stores, Inc., 307 F.2d at 10-16 (membership dues under 8(a)(3) does not include strike assessments), with American Zinc, 311 F.2d at 659 (membership dues under section 302(c)(4) does include strike assessments).
Moreover, if the meaning of “membership dues” is plain, then it seems we must accept its literal meaning. The literal meaning, however, would exclude agency fees, which the Supreme Court has held are covered under section 8(a)(3), General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670, and which undoubtedly fall within the section 302(c)(4) exception as well, see Grajczyk, 210 F.Supp. at 705-06. Nor is the company’s argument that agency fees are in fact membership dues, rather than included in “dues” as a matter of statutory construction, convincing in the least. Employees who opt not to join the union and to pay agency fees in lieu of membership dues are not members of the union, they are non-members paying agency fees so they will not have to become union members to maintain employment. The Supreme Court made this clear in General Motors, where its holding that agency fees are “membership dues” under 8(a)(3) was based on two conclusions: the statute “made significant alterations in the meaning of ‘membership’ for the purposes of union-security contracts,” 373 U.S. at 742, 83 S.Ct. 1453; and this meaning incorporated the clear intent of Congress to permit union security agreements under that statute, id.
Similarly, a literal interpretation of “dues” (as opposed to “membership”) would also exclude payments such as strike assessments, since the traditional understanding of “dues” covers only monthly (or other periodic) payments made by members, not additional assessments or fees imposed by the union. See, e.g., Food Fair Stores, Inc., 307 F.2d at 11-16. The majority nevertheless suggests it would include such assessments in the meaning of membership dues, see op. at 7, when it distinguishes this case from cases upholding other non-periodic assessments because they involve payments by “current members.” See American Zinc, 311 F.2d at 659-60 (upholding strike assessment); Schwartz, 340 F.2d at 233-34 (upholding tax imposed over and above dues). Similarly, while section 8(a)(3) expressly permits initiation fees, section 302 does not; the rationale of a literal interpretation of section 302 would also exclude initiation fees. Thus, the majority’s assertion that the statute is unambiguous is simply inconsistent with the rest of the opinion and the cases it cites.
Not only does the majority incorrectly view the term “membership dues” as unambiguous, its determination of the substance of that plain meaning — and its subsequent conclusion that the Board’s interpretation is unreasonable — is flawed as well. The Board’s interpretation is supported by a much more convincing rationale and easily meets the “reasonableness” standard we are to apply to Board interpretations of labor legislation. See *1155 Holly Farms Corp., 517 U.S. at 409, 116 S.Ct. 1396.
The majority reasons that permit fees are not comparable to other types of employee payments regarded as the equivalent of membership dues because all other types of payments are made by “current members,” and probationary employees are not union members. As discussed supra, this reasoning would make agency fees illegal under section 302 because nonmembers paying fees in lieu of membership dues are not “current members,” yet such agency fees are considered “membership dues” under the more narrowly interpreted section 8(a)(3). See General Motors Corp., 373 U.S. at 734, 83 S.Ct. 1453.
In contrast, the rationale of cases upholding broader interpretations of section 302 is logical and convincing. In Schwartz, for example, the Second Circuit held that a tax imposed over and above dues falls within section 302. See 340 F.2d at 233-34. In doing so, it reasoned that a narrow construction of section 302(c)(4) is not consistent with the limited purpose of the statute,[8] the taxes are similar to dues, it is irrelevant that the taxes were not required as a condition of employment (i.e. whether they were “dues” under 8(a)(3)), and there is no other logical or practical reason the taxes should not be permitted under section 302. Id. Similarly, in American Zinc, 311 F.2d 656, the Ninth Circuit held strike assessments are a permissible subject of checkoff under section 302. It noted the consistent position of the Department of Justice and the Board on the meaning of “dues,” which excludes “assessments” from the 8(a)(3) term “dues” but not from section 302, and further noted that interpreting dues in section 302 more broadly than in 8(a)(3) is consistent.with the different provisions and purposes of those two statutes. Id. at 659-60.
Relatedly, in Food Fair Stores, the Third Circuit upheld the Board’s consistent position that strike assessments are “dues” under section 8(a)(3) but not under section 302 because the position is “not contrary to any clearly expressed legislative intent and [is] totally reasonable.” Food Fair Stores, Inc., 307 F.2d at 16. Finally, in holding agency fees are legal under section 302(c)(4) even though they do not fall within the literal interpretation of “membership dues,” the court in Grajc-zyk reasoned that the prohibitions of the statute are directed at the relationship between the employer and the union, permitting agency fees is “thoroughly consistent” with the purpose of th'e statute, and there is no practical difference between ágency fees and members’ dues. Grajczyk, 210 F.Supp. at 705-06.
The reasoning of these cases supports my conclusion that these permit fees fall under section 302(c)(4). There is no suggestion these payments are related to union-employer corruption, they resemble dues paid by actual members, and it is consistent with the Board’s long-standing position .to so hold. See Holly Farms Corp., 517 U.S. at 405-09, 116 S.Ct. 1396 (noting that Board’s interpretation adhered to “longstanding NLRB precedent” in upholding the interpretation as reasonable).
In discerning whether the permit fees are dues under section 302, the majority also holds it is irrelevant whether the per *1156 mit fees have a “union security” purpose.[9] In fact, this is highly relevant to the interpretation of this labor statute and provides further support for the Board’s interpretation. Case law instructs us that not only is the purpose of a particular payment relevant to determining whether it constitutes “dues,” but a “union security” purpose is a particularly relevant indication that a payment constitutes “dues.” The Supreme Court has noted with approval the Board’s consideration of the purpose of payments made by members in determining whether those payments constitute “periodic dues” in section 8(a)(3). Communications Workers of America v. Beck, 487 U.S. 735, 752 n. 7, 108 S.Ct. 2641, 101 L.Ed.2d 634 (1988) (“[0]nce the Board determined that the dues were not used for collective-bargaining purposes, the conclusion that they were not dues within the meaning of § 8(a)(3) followed automatically.”); see also Master Insulators v. Int’l Ass’n of Heat & Frost Insulators, 925 F.2d 1118, 1122-23 (8th Cir.1991) (payments collected as dues but deposited in welfare funds must meet section 302 requirements for welfare funds because “it is the purpose of the payment and not the manner in which it is collected that determines its character”) (citing Beck, 487 U.S. at 752 n. 7, 108 S.Ct. 2641); Assoc. Builders & Contractors, 700 F.2d at 1275 (concluding “supplemental dues” are “membership dues” under section 302(c)(4) after finding dues were directed toward a permissible purpose under 8(a)(3)).
Beck indicates the importance the Court has placed specifically on a “union security” purpose for determining whether payments qualify as “dues,” perhaps simply reflecting that “union security” is the core, legitimate purpose of dues themselves. In Beck, the issue was whether unions could spend required agency fees on any activities other than representation activities for the direct benefit of employees in the bargaining unit. In determining whether unions could require agency fees that exceeded what was necessary to fund direct representation activities, the Court made it clear that “dues” has always included at least payments by employees who might otherwise be free riders — payments to compensate the union for its representation. Beck, 487 U.S. at 747-54, 108 S.Ct. 2641 (discussing history and purpose of section 8(a)(3)). In other words, while Beck decided that unions could not require employees they represent to pay for activities such as political organizing, it affirmed that dues unquestionably includes fees whose purpose is union security. Id. General Motors reflects a similar rationale because there the Court interpreted “dues” in section 8(a)(3) to include agency fees based primarily on construing “dues” to reflect Congress’s intent to preserve union security agreements, in spite of finding the term did not literally encom *1157 pass agency fees. General Motors Corp., 373 U.S. at 740-44, 83 S.Ct. 1453.
The Supreme Court has articulated the legislative goal of preserving union security primarily in construing 8(a)(3), but as Congressional labor policy there is every reason this principle should equally inform the construction of section 302. As the Supreme Court noted in Arroyo, section 302 “was enacted as part of a comprehensive revision of federal labor policy in the light of experience acquired during the years following the passage of the Wagner Act....” 359 U.S. at 425, 79 S.Ct. 864; see also Assoc. Builders & Contractors, 700 F.2d at 1275 (concluding “supplemental dues” were legal “membership dues” under section 302(c)(4) after determining they were spent for a proper purpose under section 8(a)(3)). Indeed, the legislative history of section 302 indicates Congress intended that its policy of preserving union security would also apply to that statute. See Grajczyk, 210 F.Supp. at 705 (history of a defeated amendment to section 302 indicates Congress wanted to permit, not prohibit, service fees under section 302).
Here, probationary employees are a legitimate subject of union security because they are members of the bargaining unit and are covered by the CBA. As noted above, see supra note 5, unions are legally obligated to represent all employees in the bargaining unit, not just those employees who are union members. Union security agreements allow unions to obtain “service fees,” or dues-like compensation, from employees they are obligated to represent but who opt not to join the union. The probationary employees are a legitimate subject of union security because they are members of the bargaining unit, are covered by the CBA, and are owed a duty of fair representation like other members of the bargaining unit.[10] See, e.g., Hodges v. Atchison, Topeka & Santa Fe Ry. Co., 728 F.2d 414, 417 (10th Cir.1984). Thus, the permit fees compensate the union for its representation of the probationary employees. This, in effect, defines membership dues to cover all members of the bargaining unit, rather than just members of the union. This is a rational way to interpret membership dues under section 302 because it is consistent with the inclusion of agency fees and, more generally, encompasses exactly those members of the unit to whom a union owes a duty of fair representation and from whom a union may legitimately collect service fees.
In conclusion, the majority goes against a substantial and well-reasoned legal and administrative tide in holding that the term “membership dues” in section 302 is unambiguous and that the Board’s interpretation is unreasonable. I find these conclusions, and the reasoning supporting them, flawed and unpersuasive. For these reasons, I respectfully dissent.

. Section 302(a) provides: "It shall be unlawful for any employer ... to pay, lend, or deliver, or agree to pay, lend or deliver, any money or other thing of value (1) to any representative of any of his employees ... or (2) to any labor organization.” 29 U.S.C. § 186(a). Section 302(b) prohibits labor organizations from demanding such payments from e/mployers. Id. § 186(b). Section 302 is a provision of the Labor Management Reporting Act, 29 U.S.C. § 186.

. Section 302(c)(4) provides: "The provisions of this exception shall not be applicable with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: Provided, That the employer has received from each employee, on whose account such deductions are made, a written assignment.... 29 U.S.C. § 186(c)(4).

. The other problems with the majority's interpretation of the CBA have less bearing on the question of statutory interpretation. The Board determined, and the company did not appeal, that the company’s eight-year practice of deducting permit fees had effectively amended the collective bargaining agreement to include this practice in the checkoff provision, yet the majority never mentions this important alteration in the contract in attempting to interpret it. The omission of this fact is at best incomplete and at worst misleading. The inclusion of this practice in the CBA was the basis for the Board's finding that the company's cessation of the practice constituted a failure to bargain over terms of employment under section 8(a)(5), 29 U.S.C. § 186(a)(5). I also disagree with the majority’s conclusion that the CBA unambiguously excludes these permit fees from “membership dues.” Of course, just because checkoff for permit fees became a contract provision does not make those fees "membership dues.” However, we cannot definitively conclude to the contrary when the provision has merely been implied in the CBA and we have no idea whether it was implied in the contract term "[membership] dues” or as a separate term. Moreover, the CBA does not even appear to use the term "membership dues” as such. The closest it comes is in the "Dues and Permit Structure” appended to the CBA, which provides a list of "Monthly Dues” to be paid "after 91 days.” Rec. vol. II, exh. 29. In addition, the checkoff provision does not refer to the dues solely of “members” but merely to dues from "all employees covered by [the CBA]....” Id. exh. 32 at 5. This provision appears to cover, for example, summer helpers. Summer helpers also remit a fee to the union and they, like other employees in the collective bargaining unit who may or may not be union members, are "employees covered by [the CBA].” Rec. vol. II, exh. 29. Similarly, probationary employees are covered by the CBA because they are in the bargaining unit, so the CBA may have already provided for checkoff for probationary employees even before this became an implied term of the contract. For these reasons, the meaning of the term "membership dues” in the CBA is at least ambiguous.

. In fact, it may well be permissible under section 8(a)(3) for the CBA to require probationary employees to pay dues in their second and third months. Section 8(a)(3) only prohibits requiring dues payments for the first 30 days of employment. 29 U.S.C. § 158(a)(3). Additionally, while probationary employees do not receive all protections of the union contract, they are members of the collective bargaining unit and receive some of the benefits of such membership. Therefore, while they might claim they should pay lower dues — based on receiving fewer benefits than more senior workers — it would not appear to violate 8(a)(3) to require probationary employees to pay dues generally as long as they were not required to do so in the first 30 days.

. Moreover, the probationary employees here may enforce these rights against their union during the probationary period. All employees at an organized shop who are in the bargaining unit, not just those who actually join the union and/or non-members paying agency fees, are protected under section 8 and may file unfair labor practice charges or a duty of fair representation claim. See, e.g., Hodges v. Atchison, Topeka & Santa Fe Ry. Co., 728 F.2d 414, 417 (10th Cir.1984) (stating collective bargaining agent “was obliged to represent" probationary employee); D’Amato v. Wisconsin Gas Co., 760 F.2d 1474, 1489 & n. 20 (7th Cir.1985) (union has duty of fair representation to probationary employees). This is because once a union is certified as the collective bargaining representative of a "bargaining unit" of employees, federal law gives the union the exclusive right to represent those employees. 29 U.S.C. § 159(a). Based on this legal authorization, unions have a corresponding duty to fairly treat and act on behalf of all employees it represents (all those in the bargaining unit), not just those who join the union. See Ford Motor Co. v. Huffman, 345 U.S. 330, 337, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) (construing 29 U.S.C. § 159(a) to include an implied duty of fair representation).
That these rights and duties apply specifically to probationary employees is well-settled. See, e.g., Hodges, 728 F.2d at 417 (rejecting probationary employee's argument that his state law wrongful discharge claim is not preempted by Railway Labor Act because he is not a union member; claim is preempted because probationary employee is “subject to the terms and conditions of employment obtained in the agreement, and the collective bargaining agent was obliged to represent him." (emphasis added)); see also D’Amato, 760 F.2d at 1489 & n. 20 (rejecting as “specious” probationary employee’s claim that he need not exhaust administrative procedures because he is probationary, noting that while such employees are at-will, " 'the right to terminate probationary employees is not unlimited,' ” and "probationary employees are members of the Union's collective bargaining unit to whom the Union owes a duty of fair representation.") (quoting Standard Oil Co. of California, 38 Lab. Arb. Awards 350, 352 (1962) (emphasis added)); W.W.J. Van Leeuwen v. United States Postal Serv., 628 F.2d 1093 (8th Cir.1980) (adjudicating duty of fair representation claim by probationary employee against his union despite that probationary employee precluded from grievance and arbitration process); Conrad v. Delta Air Lines, Inc., 494 F.2d 914, 916 (7th Cir.1974) (collective bargaining agreement limiting probationary employees’ protections from discharge "not arbitrary nor irrational” so union could reject plaintiff's grievance without violating the duty of fair representation it owed probationary employee).

. Section 8(a)(3) permits unions to demand "periodic dues and the initiation fees uniformly required” of members as a condition of their employment. 29 U.S.C. § 158(a)(3). Section 302(c)(4) permits payments from companies and unions that are wage deductions "in payment of membership dues.” 29 U.S.C. § 186(c)(4).

. In citing American Zinc, Lead & Smelting Co., 311 F.2d 656, for its holding that the term “membership dues” in the CBA checkoff provision there was ambiguous, see op. at 1149-50, the majority fails to mention that-the checkoff term was held ambiguous based on the court's holding that the statutory term was ambiguous, American Zinc, 311 F.2d at 660 ("In light of what has been pointed out earlier regarding the interpretation of the words 'membership dues’ in section 302, it is apparent that the meaning of the words 'Union membership dues’ used [in the CBA] is not so clear as to be self-evident ... ”), a position the majority specifically rejects later in the opinion, see id. at 1150-51.

. The court determined the purpose of section 302 was to 1) protect welfare funds for the benefit of employees; 2) prevent bribery of unions by employers and extortion or retribution of employers by unions; and 3) prevent abuses of power that might attend benefits funds left solely to union control. Schwartz v. Assoc. Musicians, Local 802, 340 F.2d 228, 233-34 (2d Cir.1964).

. The majority concludes union security is irrelevant in part because, the opinion asserts, this CBA has no provision for an agency shop or agency fees. See op. at 10. This misapprehends the concept of union security because under this CBA, an agency fee provision would serve absolutely no function with regard to non-probationaiy employees. All non-probationaiy employees are required to join the union and therefore pay dues — making agency fees in lieu of dues unnecessary. In other words, the requirement that all non-probationaiy employees pay dues establishes "union security.” See, e.g., NLRB v. General Motors Corp., 373 U.S. 734, 741-44, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963) (explaining both union shops and agency shops are forms of "union security" because all employees pay membership fees or their equivalent); see also Rec. at 199 (CBA Art. 2 "UNION SECURITY”). Probationary employees who agree to checkoff are voluntary subjects of this shop’s "union security.” This misunderstanding is one more reason the majority is mistaken in concluding union security is not relevant to our analysis.

. Under the CBA, while the probationary employees do not obtain all of the benefits of the CBA, notably seniority rights and access to the grievance process, many of their work conditions are nevertheless products of the collective bargaining process, such as their rate of pay and on-the-job health and safety. Whether the permit fee is the appropriate amount in light of the partial benefits probationary employees receive is a question of fair representation (that is not before us), but the fact that they receive some benefits under the CBA means they do receive representation from the union.